Janet **GREEN**, Plaintiff,

v.

**MAINE SCHOOL ADMINISTRATIVE DISTRICT # 77, et al.,**
**Defendants.**

No. Civ. 99–9–B.

United States District Court,
D. Maine.

May 6, 1999.

---

Sandra Hylander Collier, Ellsworth, ME, for plaintiff.

Melissa A. Hewey, Drummond, Woodsum, Plimpton & MacMahon, Portland, ME, for defendants.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff Janet Green ("Plaintiff") brings this action against Defendants Maine School Administrative District #77 ("MSAD 77"), Betty Jordan ("Jordan"), and John Gardner ("Gardner"). Plaintiff asserts that Defendants' failure to hire her after two years of probationary teaching constituted (i) a violation of 42 U.S.C. § 1983 under a First Amendment theory (Count VIII); (ii) a violation of the Maine Whistleblowers' Protection Act, Me.Rev. Stat.Ann. tit. 26, §§ 831–40 ("MWPA") (Count I), (iii) a wrongful discharge (Count II), and (iv) a breach of an implied covenant of good faith and fair dealing (Count III). In addition, Plaintiff claims that Defendants are liable for (i) tortious interference with an economically advantageous relationship (Count IV), (ii) invasion of privacy (Count V), (iii) intentional infliction of emotional distress (Count VI), and (iv) defamation (Count VII). Before the Court are MSAD 77's Motion for Summary Judgment on all Counts of Plaintiff's Amended Complaint and Jordan and Gardner's Motion for Summary Judgment on all Counts of Plaintiff's Amended Complaint. For the reasons outlined below, MSAD 77's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART and Jordan and Gardner's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I. SUMMARY JUDGMENT

Summary judgment is appropriate in the absence of a genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed.R.Civ.P. 56(c). For the purposes of summary judgment the Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

## II. BACKGROUND

Plaintiff worked as a probationary teacher at the Elm Street School ("Elm Street") in East Machias during the 1994–95 and 1995–96 school years. Plaintiff's area of expertise was math, though she also taught reading and served as a homeroom instructor. During the time period in question, Gardner was the principal at Elm Street and Jordan was the superintendent of MSAD 77.

Under Maine law, teachers may be employed for a probationary period not to exceed two years before they may be considered for continuing contract status, commonly referred to as "tenure."[1] In

---

1. In Maine, a "tenured" teacher's contract is automatically renewed each year unless the school district notifies the teacher in writing of her nonrenewal at least six months in advance. *See* Me.Rev.Stat.Ann. tit. 20–A, § 13201 (West 1993).

order to be considered for tenure, a probationary teacher initially must be nominated by the superintendent.

At the end of Plaintiff's two probationary years, Gardner recommended to Jordan that Plaintiff not be nominated for tenure, and Jordan did not nominate Plaintiff for tenure. At issue in this case is the reason for these two decisions. Plaintiff alleges that Gardner and Jordan failed to recommend and nominate her because she discussed alleged misconduct by Gardner with Jordan and with the police. Defendants, in contrast, claim that Gardner and Jordan decided as they did because Plaintiff exhibited problems with classroom management throughout her two probationary years and because she was unwilling to discuss or address this issue. The events leading up to the end of Plaintiff's employment relationship with MSAD 77 follow.

During Plaintiff's first probationary year, Gardner attended three different classes taught by Plaintiff.[2] In each of his three written reports, he recorded problems relating to classroom management. Gardner's October 18, 1994 observation report noted that students "were talking over and through each other" and were being "very loud and not really cooperative with each other," and that there was "always an amount of confusion during transition from unstructured to structured time frames." (Gardner Aff.Ex. 1.) In Gardner's January 13, 1995 post-observation report, he stated that "[some students] were very noisy—it was difficult to follow the lesson," and suggested that Plaintiff should "work on keeping the students productively involved so that they aren't distracting others." (Gardner Aff.Ex. 2.) On March 23, 1995, Gardner wrote in his observation report that "[Plaintiff] had to interrupt herself several times to get other groups back on task," and ·that "the

amount of off task behavior by 'many' students is taking away from good lessons." (Gardner Aff.Ex. 3.)

Gardner completed Plaintiff's 1994–95 final comprehensive evaluation on March 28, 1995, and rated her "Outstanding" in three categories, "Strong" in eighteen categories, and "Good/Expected" in twelve categories, including "[m]aintains an atmosphere that promotes learning" and "[t]eaches and maintains classroom rules." (Gardner Aff.Ex. 4.) In the comments section, he wrote:

I have found Janet to be very willing to try new ideas and to put in place new programs. She has height [sic] expectations for herself and her students. She tries to get her students to work on a level that takes them beyond the basic components of learning. She works with numerous groups durning [sic] any class period in order to better meet the needs of her students. She has been very willing to work on issues of change for herself as well as the school. As she continues to grow I believe that she will develop into an excellent teacher. She needs to continue to work on how to make good effective use of herself and her materials in order to build a better program that will better meet the needs of all students. As she continues to grow in her ability to manage the classroom and the many activities that are going on, all at the same time, her program will also be improved.

I look forward to working with her and to be [sic] able to watch her continued growth and improvement. She has been and I am sure will continue to be an asset to the school and the students.

(Gardner Aff.Ex. 4.) Plaintiff does not contest the accuracy of the three observation reports or the final comprehensive evalua-

2. In conducting these observations, Gardner was following the standard procedure according to which probationary teachers at Elm Street are evaluated: during the course of a probationary year, the principal conducts two pre-planned class observations, conducts one unannounced class observation, and completes a final comprehensive evaluation. (Gardner Dep. at 18–22.)

tion written by Gardner during her first probationary year.

Upon completing Plaintiff's 1994–95 final comprehensive evaluation, Gardner recommended to Jordan that Plaintiff be awarded a second probationary contract.[3] Jordan nominated Plaintiff for that contract, the School Board approved her nomination, and Plaintiff's contract was renewed on a probationary basis for the 1995–96 school year. Plaintiff alleges that around this time, Gardner told her she would not have to interview or appear before the School Board again in order to continue her employment with MSAD 77.

During the fall of Plaintiff's second probationary year, Gardner was involved in several controversial encounters with students. In September of 1995, the state police investigated a complaint that Gardner had physically abused a student on the first day of the 1995–96 school year. A portion of the incident in question, which involved Gardner forcibly carrying a student into a classroom and forcibly placing him in a seat, occurred in Plaintiff's classroom. (Gardner Dep. at 30–32; Green Dep. I at 60.) In addition, in mid-October 1995, some of Plaintiff's students told her that Gardner had hit a student on the head. (Green Dep. I at 58–59.)

On October 19, 1995, Gardner issued Plaintiff a written reprimand regarding her alleged failure to respond adequately to a student's verbal threat of violence. The reprimand letter, addressed to Jordan, stated that "[Plaintiff] is an excellent math teacher and has done an outstanding job ... in that area ... but if she doesn't seriously pay attention to [classroom man-

agement issues] we may in the end lose a good math teacher." (Green Dep. I Ex. 8.)

Plaintiff called Jordan the day she received Gardner's reprimand. The substance of their conversation is in dispute. Plaintiff contends she reported to Jordan that Gardner had physically abused students,[4] screamed at students, teachers, and parents,[5] lied to a parent about a student's behavior,[6] and generally lost control in a way that caused Plaintiff to be concerned about the safety of students and staff. Defendants, in contrast, allege that Plaintiff merely challenged the reprimand, complained to Jordan that she could no longer work with Gardner, and said that she could not attend a scheduled staff seminar the following day if Gardner was going to be there.

At Jordan's request, Plaintiff met with Jordan and Gardner in Gardner's office on October 30, 1995. The purpose of the meeting and the substance of the ensuing discussion are in dispute. Defendants assert that after Gardner expressed doubts about Plaintiff's classroom management abilities and after Plaintiff stated that Gardner could not objectively evaluate her teaching skills, it was agreed that Jordan would observe Plaintiff's teaching. Plaintiff, however, denies complaining about the fairness of Gardner's evaluations and denies agreeing to have Jordan observe her classes. She claims, rather, that at Jordan's instruction, she simply repeated the complaints about Gardner she allegedly had raised with Jordan during their October 19 phone conversation. After this, Plaintiff alleges, Jordan asked her not to

---

**3.** It is customary for Jordan to request Gardner's recommendation with respect to a probationary teacher before she decides whether to nominate the teacher for a second probationary contract or for tenure. (Gardner Dep. at 25.)

**4.** Plaintiff referenced one or both of the instances of alleged physical abuse noted above.

**5.** Plaintiff alleges that during the course of a September 19, 1995 meeting with parents re-

garding a history of behavior problems with certain students, Gardner told the parents Plaintiff had a problem with classroom management, and when parents questioned this, he yelled at them. Gardner denies this allegation.

**6.** Plaintiff claims that Gardner misrepresented the circumstances surrounding the incident which gave rise to her written reprimand to the mother of the student involved.

discuss what had been said with anyone and excused her.

Jordan observed classes taught by Plaintiff on two successive days, October 31 and November 1, 1995. Plaintiff claims she was surprised and upset on both occasions because it is not customary for the superintendent to participate in the observation process, and because she allegedly did not invite Jordan to observe. According to Plaintiff, there is no documentary record of Jordan conducting classroom observations of any other probationary teachers during the 1993–96 school years.

Jordan's notes from her October 31 observation of Plaintiff's seventh-grade math class mention a concern that the "Kids [were] not being actively engaged in the process." (Jordan Aff.Ex. 1.) She also made the following observations:

1 student got up put knapsack up

1 playing with straws

\*\*\*

1 student reading

1 student got up to sharpen pencil

1 student moving desk

\*\*\*

[Plaintiff] explaining up front

boys talking

girls talking

1 boy tipped back in chair

(Jordan Aff.Ex. 1.) Jordan alleges that she noticed similar problems relating to classroom management in the class she observed on November 1, and that her two observations of Plaintiff's teaching confirmed Gardner's assertion and her own suspicion that Plaintiff indeed had a classroom management problem. Plaintiff met with Jordan at the end of the day on November 1 and described the class Jordan had observed as "terrible." (Green Dep. II Ex. 11.) That same day, after school, Plaintiff and other Elm Street staff met with the local teachers' union president and discussed Plaintiff's complaints to Jordan about Gardner and Plaintiff's belief that Jordan had responded to her concerns

in a retaliatory manner. Throughout the fall of 1995, Elm Street staff held meetings, which Plaintiff attended, to address concerns about Gardner's behavior toward students, staff, and parents.

Plaintiff did not go to work on November 2, 1995. She alleges that on that day, Jordan called her doctor, Steven Weisburger ("Weisburger"), and told him that she was going to fire Plaintiff. Defendants admit that Jordan had a phone conversation with Weisburger during which Weisburger raised the subject of Plaintiff, but deny that Jordan told him she planned to fire Plaintiff or that she disclosed any confidential information regarding Plaintiff to him. Plaintiff also alleges that on the same day, during a meeting with Elm Street staff, Jordan described Plaintiff as "the problem." Jordan denies making such a statement.

Jordan claims she attempted to meet with Plaintiff to discuss more fully the October 31 and November 1 observations and to offer some constructive criticism, but Plaintiff avoided such opportunities. On November 22, 1995, Plaintiff left a note for Jordan suggesting that they meet on November 28, 1995, and Jordan agreed. When Plaintiff arrived at the scheduled meeting with two union representatives, Jordan refused to meet with her. Sometime that day, Plaintiff presented Jordan with a note stating:

What you saw on November 1, 1995, was a very stressed-out teacher. I am what went wrong that day, as I was more concerned about your presence than my own behavior. My gut instinct was to escape that room as quickly as possible but I fought the urge and stay [sic] there. I had a difficult time keeping my emotions in control. I felt like crying and a couple of times I almost did.

(Green Dep. II Ex. 13.) On December 1, 1995, Jordan wrote a letter to Plaintiff "inviting and encouraging" her to talk with Jordan and stating that "[t]he only reason I would like to meet with you is to be helpful." (Green Dep. II Ex. 14.) The

two never met to discuss Jordan's observations.

Sometime in April 1996, Plaintiff gave statements to the police and to Jordan regarding a March 1996 incident in which Gardner allegedly had punched a student in the arm.[7] Gardner admits he was aware of Plaintiff's statement to the police at the time it occurred.

Gardner repeated the standard observation cycle during Plaintiff's second probationary year. His November 28, 1995 report noted that some students were doing an assignment when they should have been listening to Plaintiff's instructions, and that "[w]hen the structured lesson ended things started to become unorganized for many students." (Gardner Aff.Ex. 5.) His March 26, 1996 report noted that "some students ... didn't know where they were when called upon," and that "[Plaintiff] had to collect two watches that were being played with." (Gardner Aff.Ex. 6.) Gardner's April 23, 1996 observation report made no obvious reference to classroom management issues. (Gardner Aff.Ex. 8.)

Gardner completed Plaintiff's 1995–96 final comprehensive evaluation on April 25, 1996,[8] and he rated her "Strong" in seven categories, "Good/Expected" in twenty-two categories, and "Minimally Acceptable" in four categories, including "[m]aintains an atmosphere that promotes learning," and "[t]eaches and maintains classroom rules." (Gardner Aff.Ex. 8.) He went on to comment that despite "some growth in certain areas of [her] teaching ... [Plaintiff] is a low average teacher because of her inability to see classroom management issues

that have come up. Her classes show a lack of structure, with little evidence of consistent rules of behavior...." (Gardner Aff.Ex. 8.) Plaintiff exercised her option to write her own comments on the evaluation form and stated, among other things, that "[t]he majority of the time the students followed the class rules and have had excellent behavior, except for the [eighth] grade class, which is a challenge for us all." [9] (Gardner Aff.Ex. 8.) Either that day or several days later, Gardner recommended to Jordan that Plaintiff not be nominated for tenure.

Jordan observed one of Plaintiff's classes, without notice, on April 30, 1996. On May 3, 1996, Jordan told Plaintiff she would not be nominating her for tenure. Plaintiff alleges Jordan refused to explain her decision and urged Plaintiff to resign, warning that unless she did, she would never teach again.

Plaintiff admits that she had classroom management problems with a particular group of students,[10] but contends that other more experienced teachers, including Gardner, also had difficulties with that group. She relies on the deposition testimony of two former colleagues to support this proposition. Plaintiff's designated mentor, teacher June Ashmore, testified that two other teachers had told her that this group of students presented difficulties, and teacher's aide Lisa Merritt testified that Plaintiff's classroom management problems were no worse than those experienced by other teachers. (Ashmore Dep. at 31; Merritt Dep. at 9–10, 37, 44.)

---

7. Plaintiff had learned of the incident from students at the time it occurred and later noticed a red mark on the child's arm. A police investigation and an internal investigation were commenced after the child's parent filed a complaint with the police. Ultimately, the grand jury did not return an indictment against Gardner and the matter was dropped.

8. This final comprehensive evaluation was completed after Plaintiff made her statement to the police.

9. Plaintiff also contested or clarified in writing the comments contained in Gardner's October 19, 1995 reprimand and in his November 28, 1995 and March 26, 1996 observation reports.

10. At some point during her second year, Plaintiff sought assistance with the issue of classroom management from her designated mentor, June Ashmore ("Ashmore"). Ashmore observed one of Plaintiff's classes and offered her some suggestions and written material on the subject.

Plaintiff also disputes Jordan's October 31 and November 1, 1995 assessments of her classroom management skills. She claims that October 31, 1995 was "a very difficult classroom management day for any teacher" and that the classes on both days "went well, although [she] was upset because of the unusual circumstance of [Jordan's] presence as an observer." (Pl.'s Stmt.Mat.Facts ¶¶ 23, 26.) Plaintiff relies on her deposition testimony that "[the November 1] class went well except I was a basketcase" and on her statement in a memo chronicling her version of events that "the students [in the October 31 class] were good and on task." (Green Dep. II at 14–15; Green Dep. I Ex. 6.) She also points to the deposition testimony of Merritt, who was present during both of Jordan's visits: "[a]s far as Janet being a problem teaching that day and the students acting up, I don't recall them—I mean, there was incidents of—like kids will do, but the kids were not—were not badly misbehaved on either one of those days." (Merritt Dep. at 25, 30.)

Plaintiff alleges that because of her October 1995 conversation with Jordan, her April 1996 participation in the inquiries conducted by Jordan and the police, and other various consultations with peers and union representatives, all of which related to alleged misconduct by Gardner, Defendants failed to recommend or nominate her for tenure in violation of the First Amendment. Plaintiff also asserts that the circumstances surrounding her failure to be considered for tenure constituted a MWPA violation, a wrongful discharge, a breach of an implied covenant of good faith and fair dealing, a tortious interference with an advantageous relationship, and an intentional infliction of emotional distress. Finally, Plaintiff asserts that Jordan defamed her by stating that she was "the problem" at a staff meeting, that Gardner defamed her when he told parents she had

a classroom management problem and later wrote in her 1995–96 final evaluation that she was a "low average teacher," and that Jordan invaded her privacy by discussing her employment with Weisburger. She claims that during her second probationary year, she suffered severe emotional distress, evidenced by weight loss, an inability to sleep, gastrointestinal difficulty, and strained relationships with her fiance and children. Her emotional distress continues today, she claims, as she has been unable to find a job in her chosen profession.

## III. DISCUSSION

### A. First Amendment

■ Plaintiff alleges that Defendants prevented her from getting tenure because she engaged in constitutionally protected speech.[11] In order to survive summary judgment on this claim, Plaintiff must demonstrate (i) that she engaged in protected speech and (ii) that the protected speech was a substantial or motivating factor in the adverse employment action taken against her. *See Wytrwal v. Saco Sch. Bd.*, 70 F.3d 165, 170 (1st Cir.1995). If Plaintiff carries this burden, Defendants then have an opportunity to show "by a preponderance of the evidence that [they] would have reached the same decision ... even in the absence of the protected conduct." *Wytrwal*, 70 F.3d at 170 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

■ The Court first must identify that portion of Plaintiff's speech that was constitutionally protected. In order for speech to be protected, it must relate to a matter of public concern and the plaintiff's interest in her expression must outweigh the defendant's interest in promoting efficient service by its employees. *Id.* at 170.

11. Plaintiff also alleges that she was subject to harassment and intimidation as a result of her protected speech. Although she does not specify which alleged actions constituted harassment or intimidation, the Court assumes she is referring to Jordan's allegedly unexpected and unprecedented visits to her classroom.

Matters of public concern are those which can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Levinsky's, Inc. v. Wal–Mart Stores, Inc.,* 127 F.3d 122, 132 (1st Cir.1997) (quoting *Connick v. Myers,* 461 U.S. 138, 146–47, 103 S.Ct. 1684, 75 L.Ed.2d 708 (U.S.1983)). "[I]ndividual personal complaints about working conditions" are not matters of public concern. *Tang v. Rhode Island, Dep't of Elderly Affairs,* 163 F.3d 7, 12 (1st Cir.1998). *See also Broderick v. Roache,* 751 F.Supp. 290, 293 n. 8 (D.Mass.1990) ("Criticism of internal workplace policies, which could be said to be of public concern when the employer is a public agency, is not protected speech when it is primarily intended to affect the internal workings of the agency.").

Defendants do not contest that Plaintiff's alleged statements during her October 1995 phone conversation with Jordan and her undisputed statements to Jordan and to the police in April 1996 constituted protected speech. They do, however, challenge Plaintiff's apparent contention that conversations she had with colleagues and union representatives about her employment qualify as constitutionally protected speech.

In her Amended Complaint, Plaintiff indicates that she "sought to consult with her peers regarding the situation between her and [Jordan and Gardner], which arose as a result of her initial complaints" and that "[Jordan and/or Gardner] instructed her to refrain from discussing the situation with anyone." (Pl.'s Am.Compl. ¶ 66.) Her Response to MSAD 77's Motion for Summary Judgment states that she "sought consultation with her peers and guidance from her union representatives regarding both the serious health and safety issues and the resulting retaliation by her supervisors." (Pl.'s Resp. MSAD 77's Mot.Summ.J. at 11). Plaintiff alleges that such consultations constituted protected speech.

■ In order to evaluate whether the speech in question relates to matters of public concern, the Court must identify the precise conversations at issue. Although Plaintiff does not offer much assistance in this regard, she appears to point to three possible instances: (i) Jordan's alleged October 30, 1995 verbal instruction to Plaintiff not to discuss her complaints about Gardner with anyone, (ii) a November 1, 1995 meeting attended by Plaintiff, Elm Street staff, and the local teacher's union president during which Plaintiff's complaints about Gardner and Jordan's allegedly retaliatory response to those complaints were discussed, and (iii) a series of Elm Street staff meetings held throughout the fall of 1995 and attended by Plaintiff during which concerns about Gardner's behavior toward students, staff, and parents were discussed.

The October 30, 1995 incident can be dismissed with little difficulty. Nowhere does Plaintiff assert that she engaged in protected speech. The other two instances, however, may implicate "matters of public concern" because Plaintiff alleges that she expressed concerns about Gardner's abuse of students during those interactions. Defendants assert that any discussions Plaintiff may have had with co-workers or union representatives concerned her personal employment situation, her personal relationships with Jordan and Gardner, or her personal opinions of how Jordan and Gardner were treating her and running Elm Street, and that therefore these conversations related to matters of personal, not public, concern. Because Defendants contest the content of these conversations, the Court concludes that there exists a genuine issue of material fact as to whether Plaintiff's speech on these two occasions related to a matter of public concern.

Defendants next argue that Plaintiff has not produced evidence supporting a prima facie showing that her protected speech was a substantial or motivating factor in the decisions not to recommend or nominate her for tenure. Jordan and Gardner assert that their recommendations of

Plaintiff for a second probationary year were accompanied by reservations about her classroom management skills, and note that Plaintiff was documented as having classroom management problems both before and after she engaged in protected conduct. The Court observes that Gardner's 1994–95 final comprehensive evaluation referenced classroom management issues—"[a]s [Plaintiff] continues to grow in her ability to manage the classroom and the many activities that are going on, all at the same time, her program will also be improved"—and that Gardner issued Plaintiff a written reprimand citing classroom management problems before she ever engaged in protected speech. Moreover, it is undisputed that Plaintiff told Jordan that the November 1 class Jordan had observed was "terrible" and later wrote Jordan a note explaining that she was "what went wrong that day."

■ Viewing the facts in Plaintiff's favor, however, the Court cannot conclude as a matter of law that Plaintiff has failed to make out a prima facie case because she has raised a genuine issue of material fact with respect to whether Jordan and Gardner were motivated to do what they did, in part or in whole, because of her protected speech. From a temporal standpoint, the record reflects that Plaintiff engaged in protected speech on October 19, 1995 and sometime during April 1996, if not on other occasions during the fall of 1995, and that Gardner told Plaintiff he would not recommend her in late April of 1996 and Jordan told Plaintiff she would not nominate her on May 3, 1996. While a suggestive sequence of events, considered alone, is not sufficient to support a prima facie case in this context, see *Acosta–Orozco v. Rodriguez–de–Rivera*, 132 F.3d 97, 101 (1st Cir.1997), Plaintiff's evidence is not limited to mere temporal proximity. The other circumstantial evidence follows.

First, Plaintiff notes that, for the most part, Jordan and Gardner led her to believe that she was doing a good job until the fall of 1995, when she made her first protected statement. It is undisputed that Gardner's 1994–95 final comprehensive evaluation was overwhelmingly positive and that Jordan nominated Plaintiff for a second probationary year based on Gardner's recommendation. Plaintiff also alleges that, around the time of her nomination, Gardner told her she would not have to interview or appear again before the School Board again in order to continue her employment with MSAD 77.

Second, Plaintiff asserts that her classroom management problems were not so great as to justify a denial of tenure and that Jordan and Gardner misrepresented her performance in order to provide a pretext for failing to hire her. With respect to Gardner, Plaintiff notes that since Gardner's 1995–96 observation reports make significantly less reference to classroom management problems than his 1994–95 observation reports, it is incongruous that Gardner's 1995–96 final comprehensive evaluation of Plaintiff would be so much more negative than the one from the prior year. With respect to Jordan's negative characterizations of her classroom management skills, Plaintiff points to Merritt's deposition testimony to the effect that there were no significant classroom management problems while Jordan was in Plaintiff's classroom.

Plaintiff also disputes Jordan's explanation for her visits to Plaintiff's classroom on October 31 and November 1, 1995, and asserts that the visits were a form of harassment and intimidation and also were intended to serve as an opportunity for Jordan to misrepresent her performance. Jordan observed Plaintiff's teaching two days in a row less than two weeks after Plaintiff complained to her about Gardner. Plaintiff alleges that it is not customary for the superintendent to participate in the observation cycle and that there is no documentary record of Jordan conducting classroom observations of any other probationary teachers during the 1993–96 school years. Furthermore, although Defendants contend that Jordan, Gardner, and Plain-

tiff agreed at an October 30, 1995 meeting that Jordan would conduct these observations, Plaintiff disputes that this was ever discussed or that she ever invited Jordan to observe.

In light of the evidence outlined above, the Court is persuaded that Plaintiff has made out a prima facie case and that it is for a factfinder to determine whether Defendants would have taken the same action in the absence of Plaintiff's protected speech. MSAD 77's Motion for Summary Judgment on Count VIII is denied.

## B. Maine Whistleblowers' Protection Act

■ Plaintiff alleges that she was treated adversely in violation of the Maine Human Rights Act, Me.Rev.Stat.Ann. tit. 5, § 4572(1)(A), for having exercised her rights under the MWPA. The analytical framework used in Title VII retaliation claims applies to MHRA retaliation claims. *See Nakai v. Wickes Lumber Co.*, 906 F.Supp. 698, 703 n. 5 (D.Me.1995). Where there is no direct evidence of the defendant's retaliatory animus, courts rely on the *McDonnell Douglas* burden-shifting framework to allocate and order the parties' evidentiary burdens. *See Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir.1996); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 827 (1st Cir.1991). To establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in conduct protected by the MWPA; (2) she suffered adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action. *See Fennell*, 83 F.3d at 535; *Hoeppner v. Crotched Mountain Rehabilitation Ctr., Inc.*, 31 F.3d 9, 14 (1st Cir.1994).

■ Once the plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for its employment decision. *See Fennell*, 83 F.3d at 535. If the defendant does so, the ultimate burden falls on the plaintiff to demonstrate both that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus. *See id.*

■ Plaintiff grounds her MWPA claim in Section 833(1)(A), which prohibits an employer from discriminating against an employee because "[she], acting in good faith ... reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States." Me.Rev.Stat.Ann. tit. 26, § 833(1)(A) (West 1988). Defendants first contend, relying on *Bard v. Bath Iron Works Corp.*, 590 A.2d 152 (Me.1991), that Plaintiff's allegations do not give rise to a MWPA claim because she reported a colleague's alleged violation, rather than a violation committed by her employer, MSAD 77.

Although the Maine Law Court has not addressed this precise question, the Court is persuaded that Defendants' argument misconstrues both the MWPA and *Bard.* No language in the MWPA specifies that an employee must report a suspected violation *by her employer as an entity*, as opposed to by an agent of the employer. Defendants urge the Court to adopt a narrow construction of the MWPA solely on the basis of a passage from *Bard* which states that the MWPA "requires an employee to prove that a reasonable person might have believed that *the employer* was acting unlawfully." *Bard*, 590 A.2d at 154–55 (emphasis added). This extracted passage, however, must be interpreted in context. *Bard* did not hold that an employee is protected under the MWPA only when he reports a suspected violation by his employer as an entity. In that case, the plaintiff claimed that his company's quality assurance processes violated the company's contract with the United States Navy and argued that the MWPA only required him to have a "good faith," as opposed to a "reasonable," belief that the company had

acted unlawfully. *Id.* at 154–54. In making the above-quoted statement, the *Bard* Court merely was responding to and rejecting the plaintiff's position as to the MWPA's state of mind requirement, *id.* at 155, and thus the weight given to the words "that the employer was acting unlawfully" by Defendants is unwarranted. In addition, in *Bard,* the plaintiff happened to be reporting alleged violations by his employer as an entity, and not by an agent of the employer, so the Court's use of the term "the employer" in that sentence is not necessarily meaningful. In the absence of any precedents or persuasive policy considerations, the Court declines to adopt Defendants' narrow interpretation of the MWPA and finds that the fact that Plaintiff reported suspected misconduct by Gardner, an agent of MSAD 77, rather than by MSAD 77 as an entity, does not defeat her claim.

■ Second, Defendants argue that Plaintiff lacked a reasonable belief that Gardner had violated any law with respect to one of the incidents she allegedly raised in her October 19, 1995 conversation with Jordan because she did not observe the incident and because she wrote a "letter of support" for Gardner regarding the incident at his request. Since the record indicates that at least part of the incident in question occurred in Plaintiff's classroom and since the record offers no indication that Plaintiff's written statement about the incident was in any way a "letter of support," the Court is persuaded that a genuine issue of material fact exists as to whether, with respect to this particular incident, Plaintiff had a reasonable belief that Gardner had committed a violation of a law or policy under the MWPA.

Finally, Defendants contend that Plaintiff's MWPA claim must fail because she has not produced evidence of a causal connection between the protected speech and the adverse employment action, and because she cannot show that their articulated legitimate, nondiscriminatory explanation is pretextual. For the reasons outlined in the above discussion of Plaintiff's First Amendment claim, the Court disagrees. MSAD 77's Motion for Summary Judgment as to Count I is denied.

## C. Wrongful Discharge

While the Maine Law Court has not ruled out recognizing the tort of wrongful discharge "when the discharge of an employee contravenes some strong public policy," *Larrabee v. Penobscot Frozen Foods. Inc.,* 486 A.2d 97, 100 (Me.1984), Defendants point out that it has yet to embrace the concept in the context presented here. *See Bard v. Bath Iron Works Corp.,* 590 A.2d 152, 156 (Me.1991). Furthermore, Defendants note that the Law Court has held that "where a statutory right and remedy are provided, there is no need to recognize a redundant tort," *Bard,* 590 A.2d at 156, and assert that since Plaintiff is maintaining claims under both Section 1983 and the MWPA, recognition of a wrongful discharge claim would therefore be "redundant." *See id.* (finding that since "[MWPA] embodies a statutory public policy against discharge in retaliation for reporting illegal acts, a right to the discharged employee, and a remedial scheme to vindicate that right," there was no need to recognize cause of action for wrongful discharge).

■ Plaintiff counters that the Law Court's reluctance to recognize a cause of action for wrongful discharge exists only in the context of employment at will and that she was not an employee at will. Apparently analogizing wrongful discharge analysis to procedural due process analysis, Plaintiff claims she was not an employee at will because she had a "property interest" in continued employment with MSAD 77. As a preliminary matter, the Court is not convinced that constitutional "property interest" analysis is required for or even relevant to the evaluation of a wrongful discharge claim. Rather, the viability of a wrongful discharge claim "hinge[s] on the question whether [one's] employment was terminable at will." *Staples v. Bangor*

*Hydro–Electric Co.,* 561 A.2d 499, 501 (Me. 1989). It is undisputed that Plaintiff was a probationary employee and that Defendants had no contractual or statutory obligation to renew her in a tenured position at the end of her second probationary year. As far as Plaintiffs candidacy for tenure, the Court is satisfied that she was the equivalent of an employee at will.

Even assuming that the "property interest" paradigm is relevant, this analysis cannot save Plaintiff's claim. The Law Court, ruling in the context of a procedural due process claim, recently reiterated that "a probationary teacher has no legitimate claim of entitlement to a contract renewal." *Lynch v. Lewiston Sch. Comm.,* 639 A.2d 630, 632 (Me.1994) (rejecting probationary teacher's claim that failure to be hired in tenured position constituted procedural due process violation). In *Lynch,* the plaintiff had been nominated for tenure by the superintendent and elected to tenure by the school committee, but was fired before the tenure contract was signed. *See Lynch,* 639 A.2d at 632. She brought a procedural due process claim and argued that the facts of her nomination and election created both a statutory duty to hire her and a mutual understanding that she would be hired (in other words, a property interest in continued employment). *See id.* The Court rejected these assertions because the third step in the statutory hiring scheme, actual employment, had not been accomplished prior to her termination, and because the facts alleged did not support the existence of a mutual understanding that she would be employed. *See id.* at 633. In the case at bar, Plaintiff did not progress as far in the hiring process as the unsuccessful plaintiff in *Lynch*—she was neither nominated for nor elected to tenure, let alone actually employed—and Plaintiff's allegations that her job performance was satisfactory do not come close to demonstrating the existence of a "mutual understanding" giving rise to a "clear expectancy" that she would be awarded tenure.

In addition, even if Plaintiff had argued that her employee at will status does not foreclose a wrongful discharge action because she was treated adversely in violation of a public policy, her claim could not go forward. Plaintiff offers no reason why recognition of a wrongful discharge claim in this case would not be impermissibly "redundant" according to *Bard* in light of her surviving First Amendment and MWPA claims. MSAD's Motion for Summary Judgment as to Count II is granted.

### D. Breach of an Implied Covenant of Good Faith and Fair Dealing

The parties' arguments with respect to this Count are largely repetitious of their positions on wrongful discharge, and this claim therefore is easily disposed of. Defendants observe that in *Bard,* the Law Court refused to recognize a cause of action for breach of an implied covenant of good faith and fair dealing in the context of employment at will, *see Bard,* 590 A.2d at 156, and further suggested that such a cause of action only would be appropriate where no other civil remedy was available. *See id.* Plaintiff responds that *Bard* does not foreclose such a claim in her case because she was not an employee at will. She again asserts that she had a property interest in continued employment with MSAD 77. For the reasons discussed above in the context of Plaintiff's wrongful discharge claim, the Court declines to recognize this particular cause of action in her case. MSAD 77's Motion for Summary Judgment as to Count III is granted.

### E. Tortious Interference with an Economically Advantageous Relationship

In order to make out this claim, a plaintiff must demonstrate: (i) the existence of a valid contract or prospective economic advantage, (ii) interference with that contract or advantage through fraud or intimidation, and (iii) damages proximately caused by the interference. *See Shaw v. Southern Aroostook Community*

*Sch. Dist.*, 683 A.2d 502, 503 (Me.1996). A showing of interference by fraud requires a demonstration that the defendant: "(1) [made] a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably [relied] on the representation as true and [acted] upon it to the damage of the plaintiff." *Grover v. Minette Mills. Inc.*, 638 A.2d 712, 716 (Me.1994). Defendants challenge Plaintiff's tortious interference with an economically advantageous relationship claim on several grounds.

■ First, Defendants argue that Plaintiff's claim with respect to Jordan fails as a matter of law because Jordan, the one individual who made the decision not to nominate Plaintiff for tenure, was a party to the prospective relationship being interfered with and therefore not a third party. In essence, Defendants contend that Jordan cannot be both the sole decisionmaker and the tortfeasor.

Plaintiff concedes that Jordan was the ultimate decisionmaker in her case, but nonetheless argues that this claim survives because MSAD 77 relied on Jordan, its agent, to evaluate and report about tenure candidates fairly and honestly, and Jordan defrauded MSAD 77 by fabricating a pretext not to nominate Plaintiff for tenure. Plaintiff urges the Court to resolve this question in light of a vexing policy problem: the fact that supervisors with influence over a decisionmaking process may transmit false information to the employer, thereby adversely affecting a plaintiff's employment.

Plaintiff's position might be persuasive in another factual context, but the facts presented here do not permit this cause of action to go forward. Plaintiff has not presented evidence demonstrating that Jordan interfered by fraud or intimidation with the decisionmaking process of *another party* such as MSAD 77 or the School Board. To the contrary, it is undisputed that the requisite first step in the tenure consideration process, nomination, is within the sole discretion of the superintendent, and that Jordan's decision not to nominate Plaintiff for tenure constituted the conclusion of the tenure consideration process. Jordan's undisputed status as the sole decisionmaker—the only person who had the authority to make the nomination decision by virtue of the statutory hiring scheme—eliminates the possibility of characterizing her as having interfered with the decisionmaking of another party.[12] As result, summary judgment for Jordan is appropriate.

■ Defendants next argue that Plaintiff has failed to produce any evidence that Gardner engaged in any interference by fraud or intimidation. The Court disagrees. The record reflects that Gardner recommended to Jordan, the decisionmaker, that Plaintiff not be nominated for tenure. The Court already has determined that a genuine issue of material fact exists as to Gardner's motivation in characterizing Plaintiff's teaching skills as deficient at that time. Specifically, the evidence reflects an oddly inverse relationship between the reports and evaluations prepared by Gardner with respect to Plaintiff over the course of her two years of teaching: while his 1995–96 observation reports make significantly less reference to classroom management problems than his 1994–95 observation reports, and his 1995–96 final comprehensive evaluation of Plaintiff was much more negative than the one from the prior year. The Court is satisfied that there exists a genuine issue of material fact with respect to whether Gardner interfered by fraud with Plaintiff's prospective employment relationship.

---

12. The Court does not hold that an employee will never have a cause of action against a supervisor or co-worker for tortious interference with an economically advantageous relationship. Rather, the Court merely holds that on the facts of this case, Plaintiff cannot do so because Jordan was the sole decisionmaker.

Jordan and Gardner's Motion for Summary Judgment on this claim is granted as to Jordan and denied as to Gardner.

### F. Invasion of Privacy

In her Amended Complaint, Plaintiff asserts that Jordan "invaded [her] sphere of privacy by calling [her] chiropractor, Dr. Weisburger, and discussing things with him, including but not limited to, Plaintiff's employment." (Pl.'s Am.Compl. ¶ 55.) This allegation implicates two of the four distinct forms of invasion of privacy: public disclosure of private facts and publicity which places the plaintiff in a false light in the public eye.

Defendants Jordan and MSAD 77 argue that Plaintiff's claim must fail as a matter of law because she has not made a sufficient showing that an invasion of privacy occurred and because Plaintiff has not alleged that Jordan disclosed information about her to the public. Defendants' first argument is dispositive. Jordan admits that she had a phone conversation with Weisburger during which he raised the subject of Plaintiff, but denies having initiated the phone call and denies discussing any employment information about Plaintiff whatsoever with him. Plaintiff has produced no evidence—only speculation—to the contrary.

Plaintiff points to allegations in her Amended Complaint that "Dr. Weisburger explained that he had talked with [Jordan] regarding [Plaintiff] and that he needed to see her" and that during Plaintiff's visit, "[Weisburger] told [Plaintiff] that [Jordan] had informed [Weisburger] that she was going to fire [Plaintiff]." (Pl.'s Am.Compl. ¶¶ 19, 20.) Both Jordan and Weisburger, however, testified consistently at their depositions that Weisburger called Jordan to express concern about Plaintiff and that Jordan did not disclose any information to

him about Plaintiff's employment situation. (Jordan Dep. at 29–30; Weisburger Dep. at 11, 16, 36–37.) Furthermore, Plaintiff herself testified at her deposition that upon her arrival at Weisburger's office, Weisburger merely "told [Plaintiff] that [Jordan] was going to fire [her]." (Green Dep. I at 93.) There is no evidence that *Jordan told* Weisburger that she was going to fire Plaintiff or that Jordan discussed any other issue relating to Plaintiff's employment with him.[13] Jordan and Gardner's Motion for Summary Judgment on Count V is granted.

### G. Intentional Infliction of Emotional Distress

 Plaintiff asserts that her allegations support a cause of action for intentional infliction of emotional distress. To state such a claim, a plaintiff must offer facts indicating that (i) the defendants intentionally or recklessly inflicted severe emotional distress or were certain or substantially certain that such distress would result from their conduct; (ii) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (iii) the actions of the defendants caused the plaintiff's emotional distress; and (iv) the plaintiff suffered emotional distress so severe that no reasonable person could be expected to endure it. *See Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me. 1979). Plaintiff alleges that Jordan's unprecedented classroom scrutiny of her, fabrication of reasons to justify a decision not to nominate her for tenure, and retaliatory decision not to nominate her for tenure, constituted "extreme and outrageous" conduct that exceeded the bounds of decency.[14] She claims that these actions

13. It is true that during her deposition, Plaintiff responded affirmatively when asked by Defendants' counsel if her "recollection [was] that Dr. Weisburger told [her] that [Jordan] had said that she was going to fire [her]." This exchange alone, however, is not suffi-

cient to support Plaintiff's claim in the face of the overwhelming evidence to the contrary.

14. Plaintiff includes Gardner in this claim, but does not specify any particular conduct on his part in either her Amended Complaint

caused her severe emotional distress, evidenced by Dr. Weisburger's testimony that she seemed to him so upset about her employment situation as of November 2, 1995 that he prescribed an antidepressant for her. (Weisburger Dep. at 22, 36.) Plaintiff also alleges, in her Statement of Material Facts, that over the course of the 1995–96 school year, her emotional distress took the form of weight loss, an inability to sleep, gastrointestinal difficulties, and strained relationships with her fiancé and children.

Defendants argue that, even if true, Plaintiff's allegations cannot support a claim for intentional infliction of emotional distress. The Court agrees. The bar set by *Vicnire* is a high one, and the evidence does not support a finding that Jordan or Gardner engaged in conduct so extreme and outrageous as to exceed "all possible bounds of decency" or conduct that "must be regarded as atrocious and intolerable in a civilized society." *Staples v. Bangor Hydro–Electric Co.,* 561 A.2d 499, 501 (Me. 1989) (*quoting Vicnire,* 401 A.2d at 154).

Viewing the evidence in a light favorable to Plaintiff, as the Court must, it indicates that Gardner and Jordan's decisions not to recommend or nominate Plaintiff for tenure, and other actions with respect to evaluating her teaching skills, may have been motivated by impermissible considerations. Consequently, as the Court indicated earlier in this opinion, Jordan and Gardner's roles in Plaintiff's failure to achieve tenure may provide bases for other causes of action. At the same time, however, evidence supporting a finding that a defendant may have violated a plaintiff's rights in the course of making an adverse employment decision does not necessarily support a finding that the defendant subjected the plaintiff to intentional infliction of emotional distress. *See Krennerich v.*

*Inhabitants of Town of Bristol,* 943 F.Supp. 1345, 1352–57 (D.Me.1996) (denying summary judgment as to former employee's Section 1983 due process claim but granting summary judgment on intentional infliction of emotional distress claim); *Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596, 601–07 (D.Me.1994) (denying summary judgment on former employee's ADEA and ADA claims, but granting summary judgment as to intentional infliction of emotional distress). Illegality alone is not the standard against which a defendant's conduct is measured in the context of an intentional infliction of emotional distress claim. *See* Restatement (Second) of Torts § 46 cmt. d (1965) ("It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that his conduct has been characterized by 'malice' . . .").

One purpose of an objective "outrageousness" requirement is to preserve this cause of action for a uniquely disturbing class of cases that defies easy categorization. The Court is convinced that the conduct implicated in the case at bar does not rise to the requisite level of "outrageousness" first articulated by the Law Court in *Vicnire.*[15] Jordan and Gardner's Motion for Summary Judgment on Count VI is granted.

## H. Defamation

■ Plaintiff alleges that she was defamed by Jordan on one occasion and by Gardner on two occasions. In order to make out a prima facie case of defamation, a plaintiff must demonstrate: (i) a false and defamatory statement concerning the plaintiff; (ii) an unprivileged publication to a third party; (iii) fault amounting at least to negligence on the part of the publisher; and (iv) either actionability of the statement irrespective of special harm or the

or her Response to Jordan and Gardner's Motion for Summary Judgment.

**15.** Defendants also argue that Plaintiff cannot demonstrate that she suffered emotional distress so severe that no reasonable person

could be expected to endure it. In light of the Court's disposition of this claim on an independent basis, it need not address this proposition.

existence of special harm caused by publication. *See Lester v. Powers*, 596 A.2d 65, 69 (Me.1991).

### 1. Jordan's alleged November 2, 1995 statement to staff that Plaintiff was "the problem" at Elm Street

Plaintiff asserts that Jordan defamed her by stating, at a November 2, 1995 staff meeting at which Plaintiff was not present, that Plaintiff was "the problem" at Elm Street. Jordan denies making this statement and Defendants argue, among other things, that Plaintiff has produced no evidence to support a finding that Jordan in fact made this statement. The Court agrees.

In her deposition, Plaintiff states that although she was not present at the meeting in question, several other staff members, including Lisa Merritt and June Ashmore, heard Jordan made the statement. (Green Dep. I at 95; Green Dep. II at 80.) As Defendants point out, however, while Merritt testified that at some point she heard someone suggest that Plaintiff was to blame for the tense atmosphere at Elm Street, Merritt also testified that she could not remember who made that statement. (Merritt Dep. at 35–36.) Moreover, Plaintiff has presented no evidence that Ashmore or anyone else heard Jordan make such a statement. In light of all this, the Court is persuaded that Plaintiff has failed to muster enough evidence to satisfy the first element of a prima facie case of defamation: a showing that Jordan made the allegedly defamatory statement in question. Jordan's Motion for Summary Judgment as to this first alleged defamatory statement is granted.

### 2. Gardner's alleged September 19, 1995 statement to parents that Plaintiff had a classroom management problem

Plaintiff alleges that during the course of a September 19, 1995 meeting attended by herself, Gardner, Merritt, and a group of parents, Gardner stated that Plaintiff had a problem with classroom management. While Gardner denies this allegation, Merritt testified at her deposition that she heard Gardner make a statement to this effect. (Merritt Dep. at 11–15.) Defendants argue that even assuming Gardner made the statement, it is not actionable because it is true. In assessing the truth or falsity of the statement, the only relevant evidence is that which came into existence prior to September 19, 1995, the date the statement in question allegedly was made. This evidence includes Gardner's three 1994–95 observation reports, his 1994–95 final comprehensive evaluation, his recommendation to Jordan that Plaintiff be nominated for a second probationary contract, Jordan's nomination of Plaintiff for a second probationary contract, and Plaintiff's allegation that Gardner said she would not have to interview or appear before the School Board again in order to continue her employment with MSAD 77.

The Court observes that all three of Gardner's 1994–95 observation reports documented classroom management problems, and that his 1994–95 final comprehensive evaluation of Plaintiff, while admittedly largely positive, did reference a need to improve classroom management skills. The fact that Gardner and Jordan recommended and nominated Plaintiff for a second probationary year is not evidence that she did not have a classroom management problem, particularly since they could have recommended and nominated Plaintiff for a tenured position at that time instead of another probationary position. In effect, all Plaintiff proffers to show that she did not have a classroom management problem *as of September 19, 1995* is Gardner's alleged assurance regarding her future employment with MSAD 77. This is not sufficient to raise a genuine issue of material fact as to the truth of the statement, and therefore Gardner's Motion for Summary Judgment as to this second alleged defamatory statement is granted.

### 3. Gardner's written comment in Plaintiff's 1995–96 final comprehensive evaluation that she was "a low average teacher"

■ Gardner wrote that Plaintiff was a "low average teacher" in her 1995–96 final comprehensive evaluation. (Gardner Aff. Ex. 8.) In her Amended Complaint, Plaintiff asserts that this statement was defamatory, that it was made with "ill will and malice ... and with knowledge, recklessness, or negligence as to the fact of [its] falsity," and that Gardner published this statement to "students, parents of students, other teachers, and perhaps others unknown to [Plaintiff]." (Pl.'s Am.Compl. ¶¶ 60–62.) Defendants argue that this statement cannot give rise to a defamation action because defamation requires publication by the defendant to a third party and there is no evidence that Gardner published the statement to a third party. Plaintiff does not address this argument or even reference this particular statement in her Response to Jordan and Gardner's Motion for Summary Judgment.

In order to support a claim of defamation, a plaintiff must produce evidence that the defendant published the defamatory statement to a third party, a person other than the plaintiff. *See Withers v. Hackett,* 714 A.2d 798, 801 (Me.1998). Plaintiff offers no such evidence in this case. To the contrary, Plaintiff's deposition testimony reveals that she has no evidence that Gardner showed the evaluation to anyone other than her. (Green Dep. II at 81–82.) Plaintiff's mere allegation that Gardner published this statement to third parties is not sufficient to withstand summary judg-

ment.[16] Gardner's Motion for Summary Judgment with respect to this third allegedly defamatory statement is granted.

### I. Respondeat Superior

■ Plaintiff contends that MSAD 77 not only is liable for Counts I (MWPA), II (wrongful discharge), III (breach of an implied covenant of good faith and fair dealing), and VIII (First Amendment), but also for any torts found to have been committed by its agents, Jordan and Gardner (Counts IV–VII).[17] MSAD 77 objects that Plaintiff did not plead this theory in her original or Amended Complaint, and argues that Plaintiff has presented no evidence that the alleged torts were committed within the scope of Jordan or Gardner's employment.

Bearing in mind that MSAD 77 does not claim to have been prejudiced in any way, a careful reading of Plaintiff's Amended Complaint reveals an assertion of respondeat superior.[18] As for the asserted lack of evidence that Jordan or Gardner acted within the scope of their employment, the Court is satisfied that Plaintiff's submissions are sufficient to raise a genuine issue of material fact on this issue. MSAD 77's Motion for Summary Judgment as to respondeat superior is denied.

### IV. CONCLUSION

For the reasons stated above, MSAD 77's Motion for Summary Judgment on Count VIII is DENIED; on Count I is DENIED; on Count II is GRANTED; on Count III is GRANTED; and as to respondeat superior is DENIED. Jordan

---

16. Defendants additionally contend, without citation to supporting authority, that since Plaintiff's performance evaluations are "confidential" under state law, *see* Me.Rev.Stat.Ann. tit. 20-A, § 6101(2)(B)(3) (West 1993), they cannot be deemed "published" for purposes of defamation. As the Court has disposed of this claim on an independent basis, it need not address this argument.

17. In light of the Court's above disposition of Plaintiff's various tort claims, MSAD 77 could

be liable under a respondeat superior theory only for Gardner's alleged tortious interference with an economically advantageous relationship.

18. With respect to Counts IV–VII, Plaintiff's Amended Complaint states that she "demands judgment against the Defendants, jointly and severally ..." (Pl.'s Am.Compl. ¶¶ 53, 55, 58 & 63.)

and Gardner's Motion for Summary Judgment on Count IV is GRANTED as to Jordan and DENIED as to Gardner; on Count V is GRANTED; on Count VI is GRANTED; and on Count VII is GRANTED.

*SO ORDERED.*