**George C.W. GOODMAN, Plaintiff,**

v.

**THE PRESIDENT AND TRUSTEES OF BOWDOIN COLLEGE; Robert H. Edwards, President, Bowdoin College; Craig W. Bradley, Dean of Students, Bowdoin College; Mya Mangawang, Assistant Dean of Student Affairs, Bowdoin College; Robert Graves, Director of Residential Life, Bowdoin College; Karen Tilbor, Assistant Dean of Student Affairs, Bowdoin College, Defendants**

**No. CIV 00–156–P–C.**

United States District Court, D. Maine.

March 16, 2001.

Mark G. Furey, Thompson, Bull, Furey, Bass & Maccoll, LLC, P.A., Portland, ME, John J.E. Markham, II, Markham & Read, Boston, MA, for Plaintiff.

James T. Kilbreth, Verrill & Dana, Portland, ME, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

This case involves allegations of violations of federal civil rights laws, 42 U.S.C. §§ 1981 and 2000d, by Defendants The President and Trustees of Bowdoin College (hereinafter Defendant "Bowdoin College") (Counts I and II), breach of contract claims against Defendant Bowdoin College (Counts III and IV), and tortious interference with contract claims against Defendants Robert H. Edwards, President of Bowdoin College, Craig W. Bradley, Dean of Students at Bowdoin College, Mya Mangawang, Assistant Dean of Student Affairs at Bowdoin College, Robert Graves, Director of Residential Life at Bowdoin College, and Karen Tilbor, Assistant Dean of Student Affairs at Bowdoin College, (Counts V and VI) for disciplinary actions taken against Plaintiff George C.W. Goodman in connection with an altercation between Goodman and another student that occurred on March 19, 1999. Now before the Court is Defendants' Motion to Dismiss with Incorporated Memorandum of Law (Docket No. 4) (hereinafter "Motion to Dismiss"). Defendants move to dismiss all counts of Plaintiff's Complaint. For the reasons that follow, the Court will grant Defendants' motion with respect to Counts III and V, and deny Defendants' motion with respect to Counts I, II, IV, and VI.

### BACKGROUND

Because the Court is considering a motion to dismiss, it "must accept as true all the factual allegations in the complaint." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993). Plaintiff's Amended Complaint (Docket No. 2) alleges the following facts.

Plaintiff, who is "Caucasian and a citizen of the United States," was a student at Bowdoin College until the Spring of 1999. Amended Complaint ¶ 1. On March 19, 1999, Plaintiff and another student at Bowdoin College, Nam Soo Lee, who is "Asian and a citizen of Korea," engaged in a physical and verbal altercation, which resulted in a bloody and broken nose to Lee and damage to the tendons on Plaintiff's right hand. *Id.* ¶¶ 1, 11, 19, 23. This altercation began when Plaintiff threw a snowball at a college van that Lee was driving and the snowball hit the van. *See id.* ¶ 19. After the snowball hit the van, Lee backed the van up to Plaintiff, yelled at Plaintiff, and got out of the van. *See id.* ¶¶ 20–21. Following an exchange of words between Plaintiff and Lee, in which Plaintiff stated to Lee that the snowball throwing had been a joke, and "lobb[ed] another snowball at the . . . van to show that there had been no harm meant," Plaintiff began to walk away from Lee and suggested that Lee return to the van. *Id.* ¶ 21. Although Lee did return to the van, instead of driving away, he backed the van towards Plaintiff. Eventually, Lee got out of the van and "caught up to Goodman from behind, then grabbed Goodman from behind, spun him around with such force that Goodman's jacket ripped from the neck opening to the waist, and then hit Mr. Goodman in the face." *Id.* ¶¶ 22–23. Plaintiff hit Lee back with the intention of defending himself, and "[a] very brief fight ensued," resulting in the alleged injuries. *Id.* ¶ 23.

The fight ended after Plaintiff pushed Lee away. *See id.* Plaintiff then returned to his residence and telephoned Bowdoin's campus security officers to report the incident. *See id.* ¶ 24. Lee radioed campus security and was taken to Parkview Hospital to have his injury examined. *See id.* ¶ 25. At Parkview, Lee stated in front of two Bowdoin Police Department officers

and one Bowdoin College security officer that he was at fault for the events of the evening and that his angry reaction towards Plaintiff had resulted not merely from being hit with the snowball, but also from other affronts that he had experienced that week, including students behaving discourteously in the van and the theft of his coat. *See id.* Later that same evening, Lee admitted his fault for the incident to two of his friends. *See id.*

The school initiated disciplinary proceedings for the stated purpose of ascertaining "the truth as to what occurred" on the night of March 19, 1999. *Id.* ¶ 26. This process consisted of three phases: a Judicial Board ("J–Board") hearing; a review of that hearing by Defendant Bradley, Dean of Students; and an appeal to the Administrative Committee, chaired by Defendant Edwards, President of Bowdoin College. *See id.* ¶¶ 26–27. In attempting to prepare for the J–Board hearing, Plaintiff was denied access to certain medical records of Lee and the opportunity to interview a security guard who had assisted Defendant Mangawang, Assistant Dean of Student Affairs, in her investigation of the incident. *See id.* ¶ 28.

The J–Board hearings took place on April 13, 1999. *Id.* ¶ 27. Acting as chair of the proceedings was a student who had previously stated to Plaintiff that she did not trust his word and expressed in writing that she would use this distrust against him if he ever appeared before the J–Board. *See id.* ¶ 28. Defendant Mangawang allowed this student to preside over the hearing, but removed from the J–Board a roommate of an eyewitness to the altercation whose testimony favored Plaintiff. *See id.* ¶ 28. During the J–Board hearings, Defendant Graves, Director of Residential Life, acted as the complainant against Plaintiff, and Defendant Tilbor, Assistant Dean of Student Affairs, acted as

the complainant against Lee. *See id.* ¶ 29. Plaintiff's hearing occurred first, and the testimony and evidence elicited at Plaintiff's hearing was adopted for the purpose of Lee's hearing. *See id.* ¶ 27. This evidence supported Plaintiff's version of the events of the night of March 19, including Plaintiff's allegation that Lee had initiated the physical confrontation by grabbing Plaintiff and hitting him in the face. *See id.* ¶ 33. Defendant Graves acted as a vigorous prosecutor at Plaintiff's hearing, while Defendant Tilbor exhibited comparatively passive conduct towards Lee. *See id.* ¶¶ 29–30. For example, the police report introduced by Goodman in support of his version of events was discredited in the proceedings, while the race-based explanations and excuses offered by Lee for his conduct towards Plaintiff on the night of March 19, and his subsequent statements concerning his fault for the incident, remained untested by Defendant Tilbor. *See id.* ¶¶ 29–30, 35–40, 42(ix). Lee also testified that he might have perceived Plaintiff's conduct as racist and offered this perception as a partial explanation for his conduct on that night. *See id.* ¶¶ 36–38. These explanations came in the form of responses to questions asked by Defendant Graves during his examination of Lee. *See id.* ¶ 38. The J–Board did not seek to exclude any of this testimony. *See id.* ¶ 41.

The J–Board determined that Plaintiff was entirely at fault for the incident and that Lee was not at fault, and it recommended the sanction of expulsion for Plaintiff. *See id.* ¶¶ 32, 34. Defendant Bradley reviewed the results of the hearing and adopted the J–Board's recommendation. *See id.* ¶¶ 27, 32, 42(xii). As part of his review of the recommendation, Defendant Bradley obtained medical records from Parkview Hospital and interviewed the doctor who had treated Lee on the night of March 19. *See id.* ¶ 42 (viii). The Administrative Committee, chaired by Defendant Edwards, affirmed this result on appeal. *See id.* ¶¶ 27, 32, 42(xii). In affirming the J–Board's result, the Administrative Committee explicitly relied on evidence that had not been presented at the J–Board hearing but that had been subsequently submitted by Defendants Edwards and Bradley, including affidavits and unsworn statements by individuals; Defendants Edwards and Bradley never submitted Plaintiff's written objection to the post-hearing use of these submissions. *See id.* ¶ (42)(x). Ultimately, while Goodman was expelled for the March 19 incident, Lee was "fully exonerated." *Id.* ¶ 1, 32.

Based on these facts, Plaintiff sets forth six claims. In Count I of the Amended Complaint, Plaintiff alleges that Defendant Bowdoin College, acting by and through Defendants Mangawang, Bradley, Graves, Tilbor, Edwards, and others, discriminated against Plaintiff in the enforcement of its Student Handbook and Academic Honor and Social Code, in violation of 42 U.S.C. § 1981. Count II alleges that Defendant Bowdoin College, a recipient of federal funding, violated 42 U.S.C. § 2000d by discriminating against Plaintiff on the grounds of race and national origin through its expulsion of him from Bowdoin College and denial of the benefits of a Bowdoin education and degree. In Counts III and IV, Plaintiff alleges breach of contract against Defendant Bowdoin College on the grounds that the college breached the promises set forth in its Student Handbook to refrain from discrimination on account of race or national origin and to conduct fair and impartial judicial proceedings in which students would have the opportunity to present evidence and witnesses. In Counts V and VI, Plaintiff alleges tortious interference with contract against Defendants Edwards, Bradley, Mangawang, Graves, and Tilbor, claiming

that by maliciously and fraudulently manipulating the J–Board proceedings, these Defendants willfully, intentionally, and with malice induced the breaches alleged in Counts III and IV of the Amended Complaint.

## DISCUSSION

Defendants have moved to dismiss all counts of Plaintiff's Amended Complaint, and they set forth several theories in support of their motion. With regard to Counts I and II, Defendants contend that Plaintiff has failed to state claims upon which relief can be granted because he has failed to allege facts showing purposeful race- or national origin–based discrimination with the degree of specificity required for civil rights claims. Defendants maintain that if the Court decides to dismiss Counts I and II, it must also dismiss Counts III–VI of the Amended Complaint for lack of diversity jurisdiction because the damages alleged by Plaintiff do not establish the requisite amount in controversy. Defendants also argue that the Court should dismiss Counts I and III–VI on the ground that Bowdoin's Student Handbook does not constitute a contract under Maine law. Alternatively, Defendants argue that Counts III and IV should be dismissed because the Amended Complaint does not allege that Defendant Bowdoin College acted arbitrarily and capriciously in its decision to expel Plaintiff and that Counts V and VI should be dismissed because Plaintiff has failed to allege fraud with the particularity required by Federal Rule of Civil Procedure 9(b). As attachments to their motion, Defendants have submitted several additional documents to the Court, maintaining that the Court may consider these documents without converting their motion into a motion for summary judgment because the documents are central to Plaintiff's Amended Complaint.

## A. Consideration of Supplemental Papers

As attachments to their Motion to Dismiss, Defendants have submitted the following exhibits to the Court: Bowdoin's *1998–1999 Student Handbook* (hereinafter "Student Handbook") (Exh. 1); a letter from Dean Mangawang to Plaintiff charging him with "[c]onduct which is unbecoming of a Bowdoin student" and "[b]ehavior which endangers the health and safety of oneself or others" (Exh. 2); the transcript of the J–Board proceedings (Exh. 3); the J–Board recommendation (Exh. 4); a letter from Dean Bradley to Plaintiff explaining the findings of the J–Board and the consequent sanction (Exh. 5); a letter from Dean Bradley to Plaintiff setting forth modifications to the sanction (Exh. 6); and a Report of the Administrative Committee Meeting of May 21, 1999 (Exh. 7). Defendants have also attached to their Reply Memorandum (Docket No. 7) a copy of Bowdoin's *Academic Honor Code/ Social Code Pledge* that Plaintiff had signed in acknowledgment of his agreement to abide by Bowdoin's Academic Honor and Social Code (hereinafter "Social and Honor Pledge") (Exh. 8). Defendants argue that although these documents technically constitute material outside the four corners of Plaintiff's Amended Complaint, the Court may consider these documents in deciding their Motion to Dismiss without converting it into a motion for summary judgment because the factual allegations in Plaintiff's Amended Complaint are expressly linked to and dependent upon these documents. Plaintiff does not oppose the Court's consideration of the Student Handbook or the Social and Honor Pledge but does oppose the Court's consideration of the other documents submitted with Defendants' Motion to Dismiss.

"When ... a complaint's factual allegations are expressly linked to—and

admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings, and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank and Trust Co.*, 137 F.3d 12, 17 (1st Cir.1998). When a document has been "incorporated by reference" into the pleadings, a defendant may introduce the document in support of its motion to dismiss. *Fudge v. Penthouse Int'l Ltd.*, 840 F.2d 1012, 1015 (1st Cir.1988). *See also Beddall*, 137 F.3d at 17. In order for a document to be incorporated into the pleadings, the Court must find that the document is " 'referred to in the plaintiff's complaint and . . . central to [a] claim.' " *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). A plaintiff's mere reference to a document or limited quotation from a document in a complaint does not render the document incorporated by reference. *See Fudge*, 840 F.2d at 1015 (citing *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985)).

■ According to these standards, the Court may consider Bowdoin's Student Handbook and the signed Social and Honor Pledge. These documents are central to Plaintiff's allegation that he has a contractual relationship with Bowdoin—an allegation on which Plaintiff's 42 U.S.C. § 1981, breach of contract, and tortious interference with contract claims depend.[1] The other documents, although possibly relevant to these claims and Plaintiff's § 1981 claim, are not so integrated into or central to Plaintiff's Amended Complaint as to be incorporated by reference. Defendants accurately point out that Plain-

tiff's Amended Complaint contains quotations from the transcript of the J–Board proceeding, *see* Amended Complaint ¶¶ 35–40, but these limited quotations do not have the effect of incorporating the transcript into the Amended Complaint. *See Fudge*, 840 F.2d at 1015. In deciding Defendants' Motion to Dismiss, therefore, the Court will rely on Plaintiff's Amended Complaint, Bowdoin's Student Handbook, and the Social and Honor Pledge.

## B. Whether Plaintiff Has Adequately Pleaded a Claim for Relief under Title 42 U.S.C. §§ 1981 and 2000d

■ Defendants urge the Court to dismiss Plaintiff's 42 U.S.C. §§ 1981 and 2000d claims, arguing that the Court of Appeals for the First Circuit has imposed a heightened pleading standard on civil rights plaintiffs and that Plaintiff has failed to allege the " 'specific facts adequate to show or raise a plausible inference that [he] was subject to race-based discrimination' " required under this standard. Motion to Dismiss at 7 (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 17 (1st Cir.1989)). Defendants characterize Plaintiff's allegations of race- and national origin–based discrimination as consisting only of factual allegations of disparate treatment and conclusory allegations asserting race or national origin as the cause of this treatment. Defendants contend that such allegations do not fulfill the pleading requirement applicable to civil rights claims in the First Circuit. Plaintiff sets forth two arguments in response. First, Plaintiff suggests that the Supreme Court's holding and reasoning in *Leatherman*, 507 U.S. at 165–68, 113 S.Ct. at 1162–63, casts doubt on the

---

1. The portion of the Student Handbook entitled "The Academic Honor Code and Social Code," is particularly relevant to Plaintiff's claims. *See* Student Handbook at 48–54.

The Court will refer to this portion of the handbook as the "Academic Honor and Social Code."

heightened pleading requirement invoked by Defendants. Second, Plaintiff argues that, even if the First Circuit's heightened pleading requirement continues to apply to his claims after *Leatherman*, his Amended Complaint does meet the applicable standard. In reply, Defendants insist that the heightened pleading requirement that they have invoked remains good law in the First Circuit with regard to claims such as those filed by Plaintiff, and they maintain that Plaintiff's allegations fall short of its standard.

Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In order to survive a motion to dismiss under this standard, a plaintiff must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988). *See also Dartmouth Review*, 889 F.2d at 16. A court should not dismiss a complaint for failure to state a claim " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Judge v. City of Lowell*, 160 F.3d 67, 72 (1st Cir.1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Accordingly, in evaluating whether a complaint sets forth sufficient factual allegations, a court must take well-pleaded facts as they appear in the complaint, indulging every reasonable inference in a plaintiff's favor. *See Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990). However, a Court must "eschew any reliance on bald assertions, unsupported conclusions, and opprobrious epithets." *Chongris v. Bd. of Appeals*, 811 F.2d 36, 37 (1st Cir.1987), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987).

At issue is whether Plaintiff's Amended Complaint adequately alleges the elements of violations of 42 U.S.C. §§ 1981 and 2000d. Title 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981(a). In order to establish a § 1981 violation, a party must establish three elements: (1) purposeful discrimination; (2) that is based on race; (3) in the making or enforcing of a contract. *See Dartmouth Review*, 889 F.2d at 17. *See also General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3151, 73 L.Ed.2d 835 (1982) (holding that 42 U.S.C. § 1981 requires a showing of purposeful discrimination). Title 42 U.S.C. § 2000d mandates that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." In order to state a claim under this statute, a private plaintiff must allege the following elements: (1) discrimination; (2) that is based on race, color, or national origin; and (3) the intent to discriminate. *See Guardians Ass'n v. Civil Service Comm'n of the City of New York*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *Alexander v. Choate*, 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985) (explaining that "the Court [in *Guardians* ] held that Title VI itself directly reached only instances of intentional discrimination"); *Dartmouth Review*, 889 F.2d at 22 ("To state a claim under Title VI, . . . a complaint must adequately allege discrimination based on a protected category . . . and must do so with the same degree of factual specificity as required in civil rights cases generally."); *Latinos Unidos De Chelsea En Accion v. Sec'y of Hous. and Urban Dev.*, 799 F.2d 774, 783

(1st Cir.1986) (setting forth element of discriminatory intent).

The element of discriminatory purpose or intent in civil rights claims "'implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected ... a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Coyne v. City of Somerville,* 972 F.2d 440, 445 (1st Cir.1992) (quoting *Pers. Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)). It is this element of intent or purpose to discriminate on the basis of race or national origin that raises the issue of whether Plaintiff faces a heightened pleading requirement with respect to his civil rights claims. Defendants rely on *Dartmouth Review,* a case involving §§ 1981 and 2000d claims in which the Court of Appeals for the First Circuit indicated that the mandate to "eschew reliance ... on unsupported conclusions," *Chongris,* 811 F.2d at 37, and the need for factual specificity in pleadings "is perhaps greater where allegations of civil rights violations lie at the suit's core." *Dartmouth Review,* 889 F.2d at 16 (citing *Dewey v. Univ. of New Hampshire,* 694 F.2d 1, 3 (1st Cir.1982), *cert. denied,* 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983)). Explaining that the Court of Appeals for the First Circuit had "consistently required [civil rights] plaintiffs to outline facts sufficient to convey specific instances of unlawful discrimination" in order to survive motions to dismiss, the court held that the complaint at issue could survive a motion to dismiss only if "given the facts averred, [the plaintiffs'] race can be said to have been an actual or decisive reason behind the alleged discrimination." *Id.* at 16–17 (citations omitted). *See also Glidden v. Atkinson,* 750 F.Supp. 25, 27 (1990). The "key question" under the court's standard was whether the plaintiffs' complaint "assembled specific facts to show or raise a plausible inference that they were subjected to race-based discrimination." *Dartmouth Review,* 889 F.2d at 17. *See also Correa–Martinez,* 903 F.2d at 51 (requiring that facts alleged in complaint "specifically identify the particular instance[s] of discriminatory treatment and, as a logical exercise, adequately support the thesis that discrimination was unlawful"). The court made clear that under its standard, "merely juxtaposing the fact of one's race with an instance of discrimination" would fail to state a claim. *Dartmouth Review,* 889 F.2d at 19.

*Dartmouth Review,* however, preceded the Supreme Court's opinion in *Leatherman,* a case in which the Court held that federal courts may not apply a heightened pleading standard to civil rights plaintiffs alleging municipal liability under 42 U.S.C. § 1983. *See Leatherman,* 507 U.S. at 165, 113 S.Ct. at 1162. Although the *Leatherman* Court decided the narrow question of § 1983 municipal liability, much of its reasoning can be understood to indicate a general prohibition on court-imposed heightened pleading requirements. Notably, the Court identified Federal Rule of Civil Procedure 9(b) as the rule that enumerated claims demanding heightened pleading requirements in the federal pleading regime and admonished that if § 1983 claims also should require heightened pleading, "that is a result which must be obtained by the process of amending the federal rules, and not by judicial interpretation." *Leatherman,* 507 U.S. at 168, 113 S.Ct. at 1163. The Court perceived the Fifth Circuit's heightened pleading requirement as "impossible to square ... with the liberal system of 'notice pleading' set up by the Federal Rules." *Id.* at 168, 113 S.Ct. at 1163.

*Leatherman,* thus, called into doubt the propriety of applying a heightened pleading standard to civil rights claims in the absence of legislative or rulemaking action. *See Feliciano v. DuBois,* 846 F.Supp. 1033, 1042 (D.Mass.1994). Defendants cite *Judge,* 160 F.3d at 74–75, and *Langadinos v. Am. Airlines, Inc.,* 199 F.3d 68, 73 (1st Cir.2000), in support of their position that *Dartmouth Review*'s heightened pleading requirement remains good law after *Leatherman.* However, neither of these opinions address the specific issue presented in this case: whether the Court must impose a heightened pleading requirement on a plaintiff bringing statutory civil rights claims against a non-governmental entity. *Langadinos* addressed the applicability of a heightened pleading requirement to a claim alleging that an airline had violated Article 17 of the Warsaw Convention by over-serving alcohol to a passenger. *See Langadinos,* 199 F.3d at 70.[2]

In *Judge,* the Court of Appeals addressed only the narrow question of whether the heightened pleading standard articulated in *Dartmouth Review* and other pre-*Leatherman* cases could properly be applied to constitutional claims involving allegations of improper motive against individual government officials. *See Judge,* 160 F.3d at 73–74. While this analysis came closer to deciding the issue presented in the instant case, significant distinctions between the circumstances of this case and those in *Judge* prevent the automatic extension of the *Judge* court's holding to the Court's evaluation of Plaintiff's Amended Complaint. In addition to the *Judge* court's narrow description of its holding,[3] the court began its analysis with its observation that the *Leatherman* Court "specifically reserved judgment on the question of whether its 'qualified immunity jurisprudence would require a heightened pleading in cases involving individual government officials.'" *Id.* at 73. This observation enabled the court to consider whether it could continue to apply *Dartmouth Review*'s heightened pleading requirement to the § 1983 claims against the defendants, police officers and a medical examiner who had invoked the qualified immunity defense but had not raised it in the motion to dismiss. *See id.* at 74 n. 9. The Court of Appeals then went on to rely extensively on *dicta* from *Crawford–El v. Britton,* a case in which the Supreme Court held invalid the D.C. Circuit Court of Appeals's requirement that a prisoner alleging a § 1983 violation by a government official must make a showing by clear and convincing evidence of improper motive in order to survive a motion for summary judgment. *See id.* at 73–75 (discussing *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)). In *dicta,* the *Crawford–El* Court recognized the D.C. Circuit Court's goal of

---

**2.** In refusing to apply a heightened pleading standard to that claim, the court took care to note that it had applied heightened pleading in only a few categories of cases. *See id.* at 73, 78 S.Ct. 99. While the court included civil rights claims in this list and cited *Dartmouth. Review* as an example, the court referred to its application of the heightened pleading requirement in the past tense and did not address the continued vitality of *Dartmouth Review* after *Leatherman. See id.*

**3.** Specifically, in holding that the heightened pleading standard survived *Leatherman,* the court stated that "[w]e believe that it does, *at least in a case like the present* alleging a constitutional violation calling for proof of an illegal motive." *Id.* at 73, 78 S.Ct. 99 (emphasis added). The court later explained that it believed that the Supreme Court would allow it to apply heightened pleading because the claim at issue *"precisely involves an action under section 1983 against state officials in their individual capacities requiring plaintiff to prove improper motive." Id.* at 74, 78 S.Ct. 99 (emphasis added).

prompt disposition of unsubstantial claims, and identified district court judges' ability to exercise their discretion to invoke procedural rules to demand "specific nonconclusory factual allegations that establish improper motive causing cognizable injury in order to survive a prediscovery motion for dismissal or summary judgment" from plaintiffs alleging civil rights violations against individual government officials as one mechanism already available to serve the intended purpose of the clear and convincing evidence requirement. *Crawford–El*, 523 U.S. at 597–98, 118 S.Ct. at 1596–97 (citation omitted). The *Judge* court viewed this *dicta* as the Justices' endorsement of the continued vitality of heightened pleading in cases against government officials. *See Judge*, 160 F.3d at 74.

It is possible to read *Judge* for the broader proposition that *Dartmouth Review*'s heightened pleading standard, even as applied to statutory civil rights claims against non-governmental actors, remains good law after *Leatherman*. *See Judge*, 160 F.3d at 74 n. 9 ("In *Crawford–El*, the Court made plain that the key factor permitting the requirement that facts, not merely a conclusion, be pleaded, was the existence of 'a claim that requires proof of wrongful motive,' not an immunity defense.") (quoting *Crawford–El*, 523 U.S. at 597, 118 S.Ct. at 1596); *Burrell v. Bd. of Trs. of Univ. of Maine Sys.*, 2000 WL 762075 (D.Me.2000) (applying heightened pleading to 42 U.S.C. §§ 1981 and 2000d claims against state university); *Tavares de Almeida v. Children's Museum*, 28 F.Supp.2d 682, 685–86 (D.Mass.1998) (quoting *Judge*, 160 F.3d at 72–73, without analysis, in articulating analytical framework applicable to a Title VII defendant's motion for judgment on the pleadings). However, consideration of *Judge* in the context of *Leatherman* and *Crawford–El* leads the Court to decline to read *Judge* broadly. The *Judge* court itself relied extensively on these two cases, which led it to carefully limit its holding to cases involving individual governmental officials, who have the option of invoking the qualified immunity defense. *See Judge*, 160 F.3d at 73–74. This limitation is particularly significant in light of the *Leatherman* and *Crawford–El* Courts' specific emphasis on the qualified immunity defense. The *Leatherman* Court left open the narrow question of whether the Court's qualified immunity jurisprudence "would require a heightened pleading in cases involving individual government officials." *Leatherman*, 507 U.S. at 167, 113 S.Ct. at 1162. This question is not presented in the instant case. The *Crawford–El* Court's endorsement of the heightened pleading standard was framed as one of the procedures available to trial court judges in executing their responsibility to "exercise [their] discretion in a way that protects the substance of the qualified immunity defense ... so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings." *Crawford–El*, 523 U.S. at 597–98, 118 S.Ct. at 1596–97. Moreover, the *Crawford–El* Court set forth several distinctions between cases implicating the qualified immunity defense and other civil rights cases, and it expressed concern over the broad-sweeping potential of the D.C. Circuit Court's heightened burden of proof. *See id.* at 589–94, 118 S.Ct. at 1592–94. Both *Leatherman* and *Crawford–El* rejected the use of judicial authority to impose heightened pleading. The *Leatherman* Court specifically identified the process of amending the Federal Rules as the appropriate mechanism. *See Leatherman*, 507 U.S. at 168, 113 S.Ct. at 1163. The *Crawford–El* Court again chastised an appellate court's imposition of a heightened standard of proof on a civil rights plaintiff in the absence of "any support" from "the text of

§ 1983 or any other federal statute, nor the Federal Rules of Civil Procedure," stating that such imposition "lacks any common-law pedigree and alters the cause of action itself in a way that undermines the very purpose of § 1983—to provide a remedy for the violation of civil rights." *Crawford–El*, 523 U.S. at 594–95, 118 S.Ct. at 1595. In light of the Supreme Court's unequivocal language regarding the impropriety of judicially imposed heightened pleading standards and the distinctions between the governmental immunity doctrine and substantive civil rights claims, without more explicit instructions from the Court of Appeals to apply heightened pleading requirements to claims that do not implicate the governmental immunity doctrine, the Court does not believe that it is wise to extend the reasoning of *Judge* to apply a heightened pleading requirement in the instant case.

■ The Court's decision not to impose a heightened pleading standard on Plaintiff leaves it to evaluate Plaintiff's Amended Complaint under the generous pleading requirements of Rule 8(a)(2). The Court will, therefore, consider whether Plaintiff's factual allegations set forth the material elements of his §§ 1981 and 2000d claims: intent or purpose to discriminate; based on race or national origin; in the making or enforcing of a contract, or the administration of a program receiving federal financial assistance. *See* discussion *supra* at 48–49. In evaluating Plaintiff's Complaint, the Court will construe all reasonable inferences in favor of Plaintiff.

Plaintiff has alleged that Bowdoin College was a program or activity receiving federal financial assistance at the time of the incident and that he had entered into a contractual relationship with Bowdoin by enrolling as a student at Bowdoin and by signing the Social and Honor Pledge. *See* Amended Complaint ¶¶ 16, 48.[4] Plaintiff's Amended Complaint sets forth several allegations in support of his claim that Bowdoin College discriminated against him on account of his race and/or national origin. Plaintiff juxtaposes his race and national origin with those of Lee, *see id.* ¶ 11, and identifies several instances of differential treatment, including the contradiction between Dean Mangawang's refusal to remove from the J–Board a student who had previously expressed a bias against Plaintiff and her decision to remove from the J–Board the roommate of an eyewitness whose testimony favored Plaintiff; Mangawang's decision to appoint a passive complainant to Lee's case and a vigorous complainant to Plaintiff's case; and the complainants' decision to allow Lee to offer race- and national origin-based excuses for his conduct and to set forth false accusations of racism against Plaintiff during the hearing. *See id.* ¶¶ 28, 29, 36–38.[5] Plaintiff also alleges that although the evidence presented to the J–Board supported his claims of innocence and suggested Lee's culpability, the J–Board ultimately exonerated Lee and held Plaintiff responsible, relying explicitly on race and cultural factors in explaining this decision. *See id.* ¶¶ 21, 25, 31, 32,

---

**4.** The Court will address the contractual aspect of this in subsection C, *infra*.

**5.** The Court notes that an allegation that the J–Board had punished Plaintiff more harshly because it perceived his acts as racist would not be sufficient to state a claim of race-based discrimination. *See Dartmouth Review*, 889 F.2d at 19 ("Without more, allegations that perceived racist infractions were punished

more harshly than other infractions do not tend to show racial discrimination against the persons accused."). However, the Court understands Plaintiff's allegation that Lee was allowed to accuse Plaintiff of racism at the hearings as one of many factors indicative of a general pattern of differential treatment based on race and national origin.

33, 34, 41.[6] Plaintiff alleges that Deans Bradley and Edwards adopted and endorsed the J–Board's race- and national originbased reasoning by approving the J–Board's recommendation to expel Plaintiff and upholding the sanction of expulsion. *See id.* ¶ 32. Construing all reasonable inferences in favor of Plaintiff, as the Court must do in deciding Defendant's Motion to Dismiss, the Court finds that Plaintiff's Amended Complaint sufficiently alleges that he suffered race- and national originbased discrimination in Bowdoin's disciplinary proceedings.

█ The Court also finds that Plaintiff's Amended Complaint sets forth sufficient factual allegations to support the inference that Defendant Bowdoin College was motivated by a discriminatory intent or purpose. In addition to the allegations of differential treatment, Plaintiff alleges that Bowdoin made the decision to favor Lee over Plaintiff because of their respective races and national origins. *See id.* ¶ 1. This otherwise conclusory allegation is bolstered by Plaintiff's allegations of Bowdoin's attempt to specially recruit and accommodate foreign students, the J–Board's issuance of race- and national originbased reasons for the differential outcomes, and Graves's encouragement and elicitation of racial accusations and racial and ethnic explanations from Lee. *See id.* ¶¶ 11, 29, 41. At this point in the proceedings, when all reasonable inferences must be construed in favor of Plaintiff, these allegations will suffice to indicate that purposeful or intentional discrimination based on race or national origin may have motivated the representatives of Bowdoin College. The Court, therefore, denies Defen-

dants' Motion to Dismiss Counts I and II for failure to state a claim upon which relief can be granted.[7]

## C. Whether A Contractual Relationship Existed Between Plaintiff and Bowdoin

Defendants also move to dismiss Counts I and III–VI, Plaintiff's 42 U.S.C. § 1981, breach of contract, and tortious interference with contract claims, on the ground that a contractual relationship did not exist between Plaintiff and Bowdoin. Defendants frame Plaintiff's alleged contractual relationship as based solely on the Student Handbook and contend that Bowdoin never manifested the requisite intent to be bound by the Handbook. Defendants cite language of the Handbook in support of their position, including the Handbook's preamble stating that Bowdoin has "provided [the Handbook] as a reference ... a guide to the policies, procedures, and governance structure of the College" and the Handbook's reservation of "the right to make changes in course offerings, degree requirements, regulations, procedures, and charges." *See* Student Handbook at 6, 103. Defendants maintain that the reservation clause renders the contract too indefinite and illusory to be enforceable. Defendants also point out that Plaintiff and Bowdoin never bargained over the content of the Handbook and that Plaintiff signed the Social and Honor Pledge only after making the decision to attend Bowdoin. Plaintiff responds by citing a number of cases that stand for the proposition that a contractual relationship does exist between a college and its students and that documents such

---

**6.** Plaintiff alleges that the J–Board relied on the same factual record to exonerate Plaintiff and expel Lee. *See* Amended Complaint ¶ 27.

**7.** This decision obviates the Court's need to address Defendants' argument that Counts

III–VI should be dismissed for lack of diversity jurisdiction. The Court has supplemental jurisdiction over Plaintiff's state law claims. *See* 28 U.S.C. § 1367(a).

as student handbooks may serve to define the terms of that relationship. Plaintiff highlights a number of aspects of the Student Handbook that he views as making the argument for a contractual relationship particularly compelling in this case. First, Plaintiff points to the fact that he was required to, and did, sign the Social and Honor Pledge. Plaintiff also points to the language of the Handbook, including its assertion that it "describes certain rights and responsibilities of Bowdoin College students," the explanation that the Academic Honor and Social Code "requires the active commitment of the College community," defined as "all faculty, students, ... and officials or other persons employed by the college and its properties," as well as its acknowledgement of "its responsibility to conduct student judicial procedures which reflect fundamental fairness" and delineation of the protections that fulfill this responsibility. See Student Handbook at 48. Plaintiff disputes that the reservation clause defeats the existence of a contractual relationship, maintaining that the terms of the handbook are sufficiently definite and that a reasonable interpretation of the meaning of the clause, particularly in light of its placement at the end of the handbook, many pages after the Academic Honor and Social Code, would require Bowdoin to follow its existing rules until Bowdoin changes its rules and a new pledge is signed.

■ The Court will apply Maine law in assessing whether a contract existed between Plaintiff and Bowdoin. Maine courts have not addressed whether a contractual relationship exists between a college and its students. However, the Maine Law Court has set forth a number of principles that will guide this Court's determination of the existence of a contract between Plaintiff and Bowdoin. First, in order for a contract to exist between parties, the "parties must have mutually assented to be bound by all its material terms; the assent must be manifested in the contract, either expressly or impliedly; and the contract must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties." *Searles v. Trs. of St. Joseph's Coll.*, 695 A.2d 1206, 1211 (1997) (quotation omitted). *See also Bragdon v. Shapiro*, 146 Me. 83, 77 A.2d 598, 601 (1951) (holding that terms of agreement regarding bonus "too indefinite or meaningless to permit recovery" because they did not set forth standard to assist fact finder and left too much discretion to the employer, but allowing recovery for value of labor). Additionally, "a reservation to either party of an unlimited right to determine the nature and extent of his performance renders his obligation too indefinite for legal enforcement, making it, as it is termed, merely illusory." *Corthell v. Summit Thread Co.*, 132 Me. 94, 167 A. 79, 81 (1933). However, if other terms of the contract limit a party's retention of a right to define its terms, such retention will not render the contract too indefinite or illusory for enforcement. *See id.* at 82 (holding that "good faith" interpretation clause and reasonableness language in contract prevented clause reserving determination of " 'basis and amount of recognition to rest entirely' " with employer " 'at all times' " from rendering contract illusory).

■ Additionally, a number of opinions by the Court of Appeals for the First Circuit and other courts within this circuit have endorsed the existence of a contractual relationship between students and colleges. Most explicit and comprehensive of these opinions is *Mangla v. Brown University*, in which the Court of Appeals explained:

The student-college relationship is essentially contractual in nature. The terms of the contract may include statements provided in student manuals and registration materials. The proper standard for interpreting the contractual terms is that of "reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it."

*Mangla v. Brown Univ.,* 135 F.3d 80, 83 (1st Cir.1998) (citing *Russell v. Salve Regina Coll.,* 938 F.2d 315, 316 (1st Cir.1991), *rev'd on other grounds,* 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), *reinstated,* 938 F.2d 315 (1st Cir.1991), and quoting *Lyons v. Salve Regina Coll.,* 565 F.2d 200, 202 (1st Cir.1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978)). *See also Cloud v. Trs. of Boston University,* 720 F.2d 721, 724 (1st Cir. 1983) (applying reasonable manifestation standard to ascertain terms of contract between student and university); *Tobin v. University of Maine Sys.,* 59 F.Supp.2d 87, 95 (D.Me.1999) (noting defendant's acknowledgment of contractual relationship between students and universities); *Dinu v. President and Fellows of Harvard Coll.,* 56 F.Supp.2d 129, 130 (D.Mass.1999) (acknowledging modern case law's acceptance of "strong, albeit flexible, contractual flavor" of relationship between universities and students, as well as role of student handbooks in defining terms of relationship); *Govan v. Trs. of Boston Univ.,* 66 F.Supp.2d 74, 82 (D.Mass.1999); *Fellheimer v. Middlebury Coll.,* 869 F.Supp. 238, 242–43 (D.Vt.1994). *But see Pacella v. Tufts Univ. Sch. of Dental Med.,* 66 F.Supp.2d 234, 241 (D.Mass.1999) (holding that contractual relationship between student and university did not include terms of the handbook because university retained right to unilaterally modify terms of handbook without notice, plaintiff neither negotiated for nor assented to terms of contract, and relevant correspondence did not call special attention to handbook).

Defendants cite a number of cases in support of their position that a contractual relationship does not exist between Plaintiff and Bowdoin, but these cases do not rule out the existence of a contractual relationship between a college and its students, and the Court finds these cases factually distinguishable from the instant case. In *Slaughter v. Brigham Young Univ.,* 514 F.2d 622, 624 (10th Cir.1975), *cert. denied,* 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 131 (1975), the court acknowledged the merits of using some aspects of contract law to analyze the relationship between colleges and students, but specifically rejected the district court's "complete adoption of commercial contract doctrine" to allow recovery under "some sort of substantial performance remedy." *See also Fellheimer,* 869 F.Supp. at 243 (noting that *Slaughter* did not completely rule out application of contract doctrine to the student-university relationship). The language of the handbook at issue was permissive rather than mandatory in *Abrams v. Illinois Coll. of Podiatric Med.,* 77 Ill. App.3d 471, 32 Ill.Dec. 680, 395 N.E.2d 1061, 1065 (1979), and, while the court deciding *Love v. Duke Univ.,* 776 F.Supp. 1070, 1074–75, *aff'd by* 959 F.2d 231 (4th Cir.1992), did not explain why it chose not to find a contractual relationship, it also based its holding on the finding that the plaintiff had failed to fulfill the terms of the university bulletin at issue. Although the court in *Southwell v. Univ. of the Incarnate Word,* 974 S.W.2d 351, 356 (1998), did hold that the bulletin itself did not create a contract because of its language reserving the right to change its policies without notice, the court went on to hold that a contract nevertheless existed between the university and the student,

and that the university's policies and requirements defined the terms of that relationship.

In light of this precedent, the Court holds that by pleading his status as a student of Bowdoin College at the time of the incident, *see* Amended Complaint ¶ 12, Plaintiff has adequately pleaded the existence of a contractual relationship between Bowdoin and himself. The more complicated question for the Court concerns whether this contractual relationship included the Student Handbook terms, the alleged violation of which forms the basis of Plaintiff's claims against Bowdoin. Plaintiff's allegation that Bowdoin promised to treat all students equally regardless of race or national origin and not to discriminate against Plaintiff on the basis of race or national origin forms the basis of Counts III and V of Plaintiff's Amended Complaint. Plaintiff's allegation that Bowdoin promised fundamental fairness, impartiality, and the opportunity to provide evidence and witnesses in its proceedings forms the basis for Counts IV and VI of Plaintiff's Amended Complaint. The Court will consider each of these alleged promises in turn, evaluating whether the Student Handbook provisions pertaining to these alleged promises raise a reasonable inference that Bowdoin should have reasonably expected Plaintiff's understanding that Bowdoin intended to be bound by these terms. *See Mangla*, 135 F.3d at 83.

■ With regard to Plaintiff's allegation that Bowdoin promised to refrain from race or national origin discrimination, Plaintiff cites to the following language in the Student Handbook:

Respect for the rights of all and for the differences among us is essential to the Bowdoin community. Discrimination ... of others because of race, religious affiliation, gender, age, sexual orientation, physical characteristics, or other characteristics has no place in an intellectual community. * * * Such practices violate both the ideals of the College and its Social Code and are subject to appropriate disciplinary sanctions. When such incidents violate the statues of the State of Maine, criminal prosecution may be pursued.

Amended Complaint ¶¶ 14, 51, 59 (quoting Student Handbook). The Court holds that, even indulging every reasonable inference in favor of Plaintiff, Plaintiff's reference to this language alone does not indicate Bowdoin's manifestation of its assent to refrain from discriminating on the basis of race, national origin, or any of the other listed categories.[8] This provision clearly serves to provide Bowdoin with the power to issue and to seek appropriate disciplinary sanctions against members of the Bowdoin community who discriminate on the basis of the forbidden grounds and to pursue criminal prosecutions in certain cases. However, nowhere in this provision does Bowdoin assume any responsibility for refraining from discrimination itself or set forth any consequences of discriminatory actions on its part. While the first two sentences of this provision refer in general terms to the Bowdoin community, these sentences serve only as expressions of ideals or intentions, expressions that alone are insufficient to constitute an offer under Maine law. *See Searles*, 695 A.2d at 1211–12. Without additional allegations of acts

---

**8.** In setting forth Count III, Plaintiff refers the Court to "elsewhere in this Complaint," but fails to specifically direct the Court's attention to any other allegations that would support the alleged contractual term. *See* Amended Complaint ¶ 51. The Court's independent review of the allegations in the Amended Complaint has not revealed any additional allegations that would lead to a reasonable inference that Bowdoin promised Plaintiff to refrain from discrimination on account of race or national origin.

or language manifesting Bowdoin's intent to be bound by a promise to refrain from discrimination, the Court cannot infer that the contractual relationship between Bowdoin and Plaintiff included the promise that Bowdoin would refrain from discrimination. The Court will, therefore, dismiss Counts III and V of Plaintiff's Amended Complaint.

 Plaintiff cites to the following language in the Student Handbook in support of its claim that Bowdoin promised to afford protections promoting fundamental fairness in its judicial proceedings and to conduct those proceedings with impartiality:

> Bowdoin College acknowledges its responsibility to conduct judicial procedures which reflect fundamental fairness. For the purposes of assuring fairness and consistency, the College adopts ... protections for students under conduct review ... impartial proceedings, the opportunity to provide evidence and witnesses ... and the right to a College member, uninvolved with the case, available for personal support at the formal Judicial Board hearing.

Amended Complaint ¶¶ 15, 55, 65 (quoting Student Handbook). By citing this provision of the Student Handbook, Plaintiff has pleaded sufficient allegations to indicate Bowdoin's manifestation of its intent to be bound by the standard of fundamental fairness, the requirement of impartiality, and the delineated procedures. In this provision, Bowdoin expressly acknowledges a responsibility and sets forth the procedures that it has adopted to fulfill this responsibility. Defendants maintain that Bowdoin's reservation of its right to unilaterally change the terms of the handbook render Bowdoin's acknowledgment of its responsibility too illusory to constitute a binding contract with regard to the promise of fundamental fairness or description of procedural protections. However, at this point in the proceedings, the Court does not view this reservation clause as sufficient to defeat the incorporation of the above terms into the contractual relationship between Plaintiff and Bowdoin. Rather, it appears to the Court from Plaintiff's Amended Complaint that Bowdoin agreed to promote certain principles and abide by certain procedures, and that Plaintiff agreed to the possibility that Bowdoin might change the procedures during his years at Bowdoin, with the understanding that Bowdoin would consequently be bound to those new procedures. Moreover, the reservation clause cited by Bowdoin does not provide an unlimited right to alter the Handbook. Instead, this clause limits Bowdoin's right to make changes to the areas of "course offerings, degree requirements, regulations, procedures, and charges." Student Handbook at 103. This clause does not reserve the right to withdraw or alter Bowdoin's promise of fundamental fairness, and the promise of fundamental fairness, thus, constrains Bowdoin's right to make changes to procedures or charges. Bowdoin, therefore, has not retained the unbridled discretion that would render its promise illusory. *Cf. Corthell*, 167 A. at 82. The allegations that Plaintiff has set forth in his Amended Complaint factually distinguish this case from *Pacella*, a case in which the court found that the plaintiff had not signed the student handbook in question and that no special emphasis had been placed on the handbook in the relevant interaction between the student and the university. *See Pacella*, 66 F.Supp.2d at 241. Hence, the Court will not dismiss Counts IV and VI on the ground that the relevant Handbook provision did not constitute a term of the contractual relationship between Bowdoin and Plaintiff. Likewise, Plaintiff's 42 U.S.C. § 1981 claim, Count I, will not be dismissed on this ground.

### D. The Sufficiency of Plaintiff's Allegations of Bowdoin's Breach

Defendant also moves to dismiss Plaintiff's breach of contract and tortuous interference with contract claims, Counts III–VI, on the ground that the Court's review of university disciplinary decisions is limited to an arbitrary and capricious standard. The Court's decision to dismiss Counts III and V of Plaintiff's Amended Complaint leaves it to evaluate this argument only with regard to Counts IV and VI. After reviewing the cases that Defendants have brought to the Court's attention and Plaintiff's Amended Complaint, the Court holds that Plaintiff's remaining contract claims should not be dismissed on this ground.

Maine law governs the Court's evaluation of these state law claims. Defendants have cited a number of cases involving the application of other states' contract doctrine to the student-university relationship. Two of these opinions offer little, if any, persuasive force in support of Defendant's position. *See Russell* 890 F.2d at 489 (referring, in *dicta*, to a principle of deference towards college disciplinary and academic decisions, but refusing to defer to college's academic evaluation of plaintiff); *Fellheimer*, 869 F.Supp. at 243–44 (interpreting less binding handbook language). While two of the cases involve application of Massachusetts contract principles, the Court views the analytical framework offered by these cases as being helpful to its evaluation of Plaintiff's Amended Complaint. *See Cloud*, 720 F.2d at 724–25 (quotations omitted); *Pacella*, 66 F.Supp.2d at 241–42. In these cases, the courts held that when handbook terms are deemed to constitute terms of the contract between a student and a college, a court should evaluate a college's disciplinary hearing procedures "to ensure that they fall within the range of reasonable expectations of one reading the relevant rules"; in contrast, when a college-student contractual relationship does not incorporate express terms, such as those from a handbook, a court should evaluate its disciplinary decisions under an arbitrary and capricious standard, finding in favor of a student only when it determines that a college has failed to "act in good faith and on reasonable grounds." *Cloud*, 720 F.2d at 724 (quotations omitted). *See also Pacella*, 66 F.Supp.2d at 241–42.

As discussed *supra*, Part C, the Court holds that Plaintiff's contractual relationship with Bowdoin includes the Handbook term promising that Bowdoin would abide by certain procedures to ensure impartial proceedings and fundamental fairness. Thus, instead of applying the arbitrary and capricious standard, the Court will assess whether Plaintiff's allegations indicate that Bowdoin's actions fell outside a reasonable understanding of this promise. Plaintiff's Amended Complaint alleges a number of actions that indicate a violation of this promise, ranging from Bowdoin's decision to allow a biased student to chair the J–Board proceedings to the disparate prosecutorial vigor exhibited towards Lee and him during the proceedings. *See* Amended Complaint ¶ 42(iv), (iii). Therefore, the Court will not dismiss Counts IV and VI for failure to state a claim.

### E. The Sufficiency of Plaintiff's Allegations of Fraud

The Court finally turns to Defendants' contention that Counts V and VI of Plaintiff's Amended Complaint should be dismissed for failure to state a claim because Plaintiff has failed to allege any instances of fraud in support of that claim. The Court's decision to grant Defendant's motion to dismiss Count V leaves it to resolve this argument only with respect to Count VI. Defendants argue that Maine law re-

quires the element of fraud to be satisfied in tortious interference with contract claims, that Federal Rule of Civil Procedure 9(b) requires the pleading of fraud with particularity, and that Plaintiff's Amended Complaint fails to set forth any such instances of fraud. Plaintiff responds that tortious interference with contract can be established under Maine law by either fraud or intimidation and that his Amended Complaint adequately alleges both fraud and intimidation with regard to each of the individually named Defendants in this suit. Plaintiff alternatively moves for leave to amend if the Court finds that Plaintiff has failed to plead fraud with adequate specificity.

 A claim for tortious interference with contract under Maine law requires a showing of an existing contractual relationship and that "fraud or intimidation procur[ed] the breach of a contract that would have continued but for such wrongful interference." *June Roberts Agency v. Venture Props., Inc.*, 676 A.2d 46, 50 (Me.1996) (quoting *Grover v. Minette–Mills, Inc.*, 638 A.2d 712, 716 (1994)). *See also Green v. Maine Sch. Admin. Dist.*, 52 F.Supp.2d 98, 111–12 (D.Me. 1999). Fraud consists of the following elements: the making of a false representation; of a material fact; with knowledge or reckless disregard of its falsity; for the purpose of inducing reliance; and justifiable reliance. *See id.* at 112 (citing *Grover* 638 A.2d at 716). Federal Rule of Civil Procedure 9(b) requires that a party alleging fraud or mistake must plead with particularity "the circumstances constituting fraud or mistake." This special pleading requirement applies to state law claims filed in federal court. *Cf. Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.1985). Hence, while a federal court evaluates whether a party has adequately pleaded the elements of fraud according to state

law standards, the assessment of whether a party has adequately pleaded the circumstances of fraud is measured by federal law. *See id.* To serve Rule 9(b)'s main purpose of giving notice to a defendant of the claims of fraud and the acts forming the basis of the claims, federal courts require plaintiffs to specify the "time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *Id.* at 443–44 (quotation omitted). *See also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193–94 (1st Cir.1999).

Upon review of Plaintiff's Amended Complaint, the Court concludes that Count VI should not be dismissed at this point in the proceedings. Plaintiff has pleaded the time, place, and content of the representations that he alleges to be fraudulent sufficiently to put Defendants on notice of the alleged actions and inactions that form the basis of Plaintiff's tortious interference with contract claim. Although the Court has serious concerns about the merits of Plaintiff's assertion of fraudulent conduct on the part of the individual Defendants and Plaintiff's ability to bring a tortious interference with contract claim against the same individuals whose actions constitute Plaintiff's breach of contract claim, the parties have not briefed this latter issue and the Court is constrained to construe all reasonable inferences in favor of Plaintiff in evaluating his Amended Complaint. *See Correa–Martinez*, 903 F.2d at 52. Given Plaintiff's allegation of the veracity of his version of the events of the night of March 19, 1999, and of the contrasting falsehood of Lee's testimony, *see* Amended Complaint ¶ 29, 41, the Court cannot conclude that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim" that Defendants acted with deliberate falsehood or reckless disregard of the truth during the preparation of the case against Plaintiff,

the presentation of the case to the J–Board, or the J–Board review process. *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 102. The Court does note, however, that other than with respect to his allegation that Defendant Graves exhibited intimidating behavior towards a witness during the J–Board proceedings, *see* Amended Complaint ¶ 29, Plaintiff has not pleaded, in either a factual or conclusory fashion, the procurement of Bowdoin's breach of contract through intimidation. Plaintiff's tortious interference with contract claim will, therefore, be limited in subsequent proceedings herein to his allegations of fraud.

## CONCLUSION

For the reasons discussed above, the Court **ORDERS** that Defendants' Motion to Dismiss Counts III and V of Plaintiff's Amended Complaint be, and it is hereby, **GRANTED**, and Defendants Motion to Dismiss Counts I, II, IV, and VI of Plaintiff's Amended Complaint be, and it is hereby, **DENIED**.